Lauriat, J.
INTRODUCTION
These consolidated actions arose from a decision of defendants Boston University ("BU”) and the School Committee of the City of Chelsea (“School Committee”) to enter into a contract pursuant to which BU would participate in managing the Chelsea public school system. The plaintiff groups in the two actions, the “Devlin plaintiffs” and “51 Hispanic plaintiffs,” filed separate lawsuits, which were subsequently consolidated, in which they challenged the validity of defendants’ actions on a variety of constitutional and statutory grounds.
The School Committee has moved to dismiss, pursuant to Mass.R.Civ.P. 12(b)(1), for lack of jurisdiction, and 12(b)(6), for failure to state a claim upon which relief can be granted. BU has joined in the School Committee’s motion to dismiss. BU has moved for summary judgment, pursuant to Mass.R.Civ.P. 56(c). The School Committee has joined in BU’s motion. The Devlin plaintiffs and the 51 Hispanic plaintiffs have filed a joint cross-motion for summary judgment. All of the above motions are presently before the court.
BACKGROUND
In the late 1980s, after extensive negotiations, BU and the School Committee agreed upon a contract (“the Contract”), pursuant to which BU would participate in managing the Chelsea public school system. On March 29, 1989, the School Committee approved the Contract by a vote of 4-2-1. The Contract was signed by the chairman of the School Committee, the president of BU, the president of the Chelsea Board of Aldermen (“the Aldermen”), and the mayor of Chelsea.[1]
Pursuant to clause (I) of the Contract, its validity was predicated upon the Aldermen and the General Court approving a home rule petition authorizing the Contract. On May 1,1989, the Aldermen approved the home rule petition, which became the Enabling Act. The Legislature approved the Enabling Act, and the governor signed it into law on June 13, 1989.
The Devlin plaintiffs filed suit in the Superior Court on November 23,1988 (No. 88-6634-D), before the Contract was executed and the Enabling Act passed. They sought a preliminary injunction to prevent the School Committee from entering into the Contract with BU. On November 29, 1988, the court denied the Devlin plaintiffs’ request for injunctive relief. They did not renew this request.
On December 19, 1988, the School Committee moved to dismiss the action pursuant to Mass.R.Civ.P. 12(b)(6). On December 20, 1988, BU moved to dismiss the action pursuant to Mass.R.Civ.P. 12(b)(1). On February 22, 1989, the court (Steele, J.) denied both motions'to dismiss. On November 14,1989, the Devlin plaintiffs filed a Supplement to Complaint.
On June 13, 1989, the day the governor signed the Enabling Act, the 51 Hispanic plaintiffs filed suit in the Supreme Judicial Court (No. 89-284). The 51 Hispanic plaintiffs filed an Amended Complaint on *356 August 16, 1989. On July 27, 1990, the 51 Hispanic plaintiffs filed a Substituted Amended Complaint.
On November 23, 1990, the Supreme Judicial Court transferred the 51 Hispanic suit to the Superior Court (No. 90-7273-D). On April 16, 1991, the 51 Hispanic plaintiffs filed a one-count complaint in the Superior Court. The Devlin and 51 Hispanic suits were consolidated in the Superior Court on April 2, 1992.
DISCUSSION
I. The Complaints
The first issue the court must address is which one of the 51 Hispanic complaints that have been filed is properly before the court. To date, the 51 Hispanic plaintiffs have filed four complaints, three in the Supreme Judicial Court (Complaint, Amended Complaint, Substituted Amended Complaint), and a one-count complaint filed in the Superior Court on April 16, 1991.
When the Supreme Judicial Court transferred the 51 Hispanic case to the Superior Court on December 3, 1990, plaintiffs were not required to replead. See Mass.R.Civ.P. 81(f). Nevertheless, on April 16, 1991, plaintiffs filed a complaint in the Superior Court. Plaintiffs did not title this complaint as an amended complaint. In the cover letter to the Clerk of the Superior Court for Suffolk County, to which plaintiffs appended the complaint for filing, counsel for plaintiffs stated that the complaint was the same as that which was before the Supreme Judicial Court, with appropriate changes in the caption. However, upon comparing this complaint with the Substituted Amended Complaint that was before the Supreme Judicial Court, it is apparent that they differ in more respects than just the captions. In the second complaint, plaintiffs have rephrased the factual allegations originally set forth in the Substituted Amended Complaint. Moreover, in the second complaint, plaintiffs dropped most of their claims for relief, with the exception of the primary claim in this case — that the BU-Chelsea arrangement violates the anti-aid amendment to the Massachusetts Constitution. In effect, therefore, the one-count complaint filed in the Superior Court on April 16, 1991, is an amended complaint. There thus remains the issue of whether the court should consider the prayers for relief that the plaintiffs did not include in their April 16, 1991 amended complaint.[2]
An amended complaint does not automatically extinguish the prior complaint for all purposes. National Construction Co., Inc. v. National Grange Mutual Ins. Co., 10 Mass.App.Ct. 38, 40 (1980).
As a matter of practice, a change in the allegations can be made in one of two ways. The first is by setting out the desired amended facts with reference to, or incorporation of, the remaining unaltered allegations. When this procedure is followed, neither the complaint nor the amendment is complete in itself, and the two pleadings must be read together to fully ascertain the cause and scope of the action. The second method is by setting out in an amended complaint the allegations as expanded, altered or otherwise changed, and reasserting the intact allegations as originally recited. Under this procedure the amendment is complete in itself, and resort to the original pleading is unnecessary for full comprehension of the action. The difference between these procedures is one of style and professional preference. However, when the second method of amendment is employed, any matters which are not restated in the amended complaint are deemed waived or abandoned. Id.
Because plaintiffs, in the Superior Court complaint filed on April 16, 1991, restated the factual allegations as originally set forth in the Substituted Amended Complaint but dropped most of their claims for relief, the court would be warranted in considering those claims abandoned.[3] Id. However, the court will not do so, for the reasons discussed below.
In examining the record for the purposes of the current motions, the court found that the record did not contain several documents, including several of the 51 Hispanic complaints. The court therefore contacted counsel for defendant BU and requested the needed documents, which were promptly provided. Opposing counsel was made aware of the court’s several requests for documents. Based on the court’s requests for several of the 51 Hispanic complaints filed in this matter, plaintiffs’ counsel apparently opined that there existed a question in the court’s mind as to which complaint was operative.
Plaintiffs’ counsel then wrote to counsel for defendant BU on July 7, 1994, and objected to any dispute regarding the operative 51 Hispanic complaint, because the parties had always treated the Substituted Amended Complaint as the operative one. Plaintiffs’ counsel stated “We were not sure of the procedures that are followed when a case is transferred and we filed it by mistake. I believe there is a writing somewhere that reflects this, but, to date, I cannot find it.” He also informed counsel for defendant BU that he had forwarded a copy of the Devlin plaintiffs’ Supplement to Complaint to the law clerk assisting the court with this matter.
While plaintiffs’ counsel may have been mistaken about the applicable procedures when a case is transferred from the Supreme Judicial Court to the Superior Court, an attorney practicing in the Commonwealth is expected to know or ascertain the applicable rules, and a mistake will not ordinarily excuse non-compliance. The court is very reluctant to allow plaintiffs to resurrect an abandoned complaint. However, because it does appear that the parties have treated the Substituted Amended Complaint as the operative 51 Hispanic complaint, and in the interests of justice, the court will address the issues raised in that complaint.
II. The Claims
The plaintiffs have presented a litany of theories in their quest to invalidate the BU-Chelsea arrangement, which they allege violates the state constitution and several statutes. Their primary allegations are as fol *357 lows: (1) the Contract and Enabling Act violate the anti-aid amendment, Mass. Const. Art. Amend. 18, §2; (2)the “takeover” represents an unconstitutional delegation of power in violation of Mass. Const., Part I, Articles 1, 5, and 10, Part II, c. 1, §1, Art. 4, and Mass. Const., Part I, Art. 30 (plaintiffs have here included an “as applied” allegation); (3) the “takeover" violated the Home Rule Amendment, Mass. Const. Art. Amend 2, §1; (4) the procedure by which the Enabling Act was adopted did not comply with the Home Rule Amendment, the Chelsea Ciiy Charter, and the rules of the School Committee; (5) the “takeover” violates the equal protection rights of the citizens of Chelsea under the Massachusetts Constitution; (6) the “takeover” violates the due process rights of the Chelsea teachers under the Massachusetts Constitution; (7) the Contract and Enabling Act improperly exempt BU from a variety of statutes, including those pertaining to open meetings and public records, personnel records and collective bargaining information, tort liability, indemnification, and public audits; and (8) the Transitional Bilingual Education Act, G.L.c. 71 A, has been violated.
Plaintiffs have also set forth several minor allegations. They allege: disregard for the democratic process (Devlin plaintiffs Supplement to Complaint, ¶19-23); the School Committee’s attorney had a conflict of interest (id., at ¶24-26); a violation of the right of the School Committee to manage and control the Chelsea public schools (id. at ¶20); a violation of the equal protection rights of the Chelsea teachers (See id. at p. 16, caption); the Aldermen erred in failing to hold a general meeting of Chelsea voters before acting on the Enabling Act (51 Hispanic Substituted Amended Complaint, ¶43-44); and a violation of the due process rights of the citizens of Chelsea (id. at ¶47; 51 Hispanic Supplement to Complaint ¶76).
Although plaintiffs include the above allegations in their complaints, they do not address these claims in their briefs, and the court does not consider them further. It is quite evident from plaintiffs’ briefs that the above claims are not the focus of these actions.
III. Motion to Dismiss
A. Standard
When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must take the factual allegations of the complaint, as well as any reasonable inferences which can be drawn from those allegations in the plaintiffs favor, as true. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991), and cases cited. The “complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See also Charbonnier v. Amico, 367 Mass. 146, 152 (1975); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). A complaint is not subject to dismissal if it would support relief on any theory of law. See Whitinsville Plaza, supra at 89.
B. Analysis
The School Committee, joined by BU, has moved to dismiss all claims of both plaintiff groups pursuant to Mass.R.Civ.P. 12(b)(1), for lack of jurisdiction, and 12(b)(6), for failure to state a claim upon which relief can be granted. They allege that:
(1) There is no general equity jurisdiction under G.L.c. 214, by which this court may entertain taxpayer suits intended to restrain municipalities from making contracts;
(2) Plaintiffs lack standing under G.L.c. 40, §53;
(3) The requirement of standing is not avoided by a prayer for declaratory relief, nor is there jurisdiction under G.L.c. 231A to render a declaratory judgment about the constitutionality of proposed legislation;
(4) The Transitional Bilingual Education Act (‘TBEA”), G.L.c. 71A, does not provide a private right of action;
(5) The section of the TBEA upon which plaintiffs rely, G.L.c. 71A, §8, was repealed in 1978; and
(6) The Legislature’s repeal of G.L.c. 71, §34 precludes ten taxpayer petitions to challenge funding decisions for public education.
Plaintiffs oppose defendants’ motion on several grounds, the first of which is that defendants’ motion is, in substance, a motion for reconsideration of the court’s (Steele, J.) earlier denial of defendants’ motions to dismiss. Plaintiffs allege that the court already considered and denied the defendants’ argument that plaintiffs lack standing under G.L.c. 40, §53, the “ten taxpayer" statute. See Defendant Trustees of Boston University’s Reply to Plaintiffs’ Opposition to Defendants’ Motion to Dismiss, p. 8-9.
Counsel for defendants have questioned whether their motion for leave to file a reply brief was ever allowed by the court, see Superior Court Rule 9A(3), and hence, whether this court can consider their reply brief in determining whether the court has already addressed the standing issue under the ten taxpayer statute. Although it is apparent that the motion judge had defendants’ reply brief before him at the time of the hearing on the original motions to dismiss, as a copy of it was hand-delivered to him,[4] a review of the docket sheet does not show that the motion for leave to file the reply brief was ever allowed.
However, upon reviewing the plaintiffs’ opposition to the defendants’ original motions to dismiss, the court ascertained that plaintiffs raised the ten taxpayer issue, as well as the G.L.c. 214 issue, in their Memorandum in Opposition to Defendants’ Motions to Dismiss. It is thus apparent that the judge considered and rejected defendants’ motions to dismiss on one or more of those grounds.
*358 A judge should hesitate to act where he may be required to undo the work of another judge. See King v. Globe Newspapers, 400 Mass. 705, 707 (1987). Nevertheless, because the motion judge did not articulate his reasons for denying the motions to dismiss, this court has considered the jurisdictional issue and it too denies the defendants’ motion to dismiss on that ground.
Plaintiffs have invoked this court’s jurisdiction pursuant to G.L.c. 214,[5] and G.L.c. 40, §53. They seek declaratory relief pursuant to this court’s power under G.L.c. 231A.
1. G.L.c. 214
Defendants allege that there is no general equity jurisdiction under G.L.c. 214 to review taxpayer suits attempting to restrain municipalities from carrying out allegedly invalid contracts. Plaintiffs do not address this issue in their opposition to defendants’ motion to dismiss, or otherwise oppose defendants’ motion on this issue. The defendants are correct. See Pratt v. City of Boston, 396 Mass. 37, 42 (1985), quoting Fuller v. Trustees of Deerfield Academy, 252 Mass. 258, 259 (1925). Plaintiffs must therefore show a statutory basis for standing. Id.
2. The Ten Taxpayer Statute, G.L.c. 40, §53
Defendants contend that plaintiffs lack standing to sue under G.L.c. 40, §53, because the plaintiffs’ pecuniary interests are not adversely affected by the agreement with BU. The statute provides in relevant part:
If a town [or] regional school district... or any of its officers or agents are about to raise or expend money or incur obligations purporting to bind said town [orl regional school district ... for any purpose or object or in any manner other than that for and in which such town [or] regional school district . . . has the legal and constitutional right and power to raise or expend money or incur obligations, the superior court may, upon petition of not less than ten taxable inhabitants of the town, or not less than ten taxable inhabitants of any town in the regional school district . . . determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such corporate power.
(Emphasis added.)
In support of their assertion that the plaintiffs lack standing, the defendants rely primarily upon Richards v. Treasurer and Receiver General, 319 Mass. 672 (1946). In Richards, the Court ruled that the remedy of the ten taxpayer statute was “confined to those whose pecuniary interests would be adversely affected if they were compelled to pay for an expenditure which the municipality had no right to make or which was not incurred in the manner prescribed by law.” 319 Mass. at 676. Because provision had been made for reimbursing the Commonwealth for the alleged illegal expenditures, see Sears v. Treasurer & Receiver General, 327 Mass. 310, 319 (1951), and the taxpayers would not ultimately bear the burden, the Court ruled there that plaintiffs lacked standing. Relying on Pratt, supra at 44, the defendants here also allege that BU’s management of already budgeted funds does not constitute spending money. Finally, defendants allege that the School Committee is not a proper party to a ten taxpayer suit.
The defendants’ reliance on Richards is misplaced. In East Side Construction Co., Inc. v. Adams, 329 Mass. 347, 351-52 (1952), the court ruled that the remedy under the ten taxpayer statute “should not be impeded by contentions or defences [sic] that, somehow or other, a particular violation of the statutory mandate might not cause a pecuniary loss.” The language of the ten taxpayer statute should be given a liberal construction; it contains no exceptions. Id. The Supreme Judicial Court recently reaffirmed this principal in Edwards v. Boston, 408 Mass. 643, 646 (1990), where it held that taxpayers have the right to insist that provisions for their security be observed, even if they suffer no harm. “In cases brought under G.L.c. 40, §53, the taxpayer plaintiffs act as private attorneys general, enforcing laws designed to protect the public interest.” Id.
Plaintiffs have alleged a violation of the anti-aid amendment to the Massachusetts Constitution, Mass. Const. Art. Amend. 18, §2. Their principal contention is that public funds may not be used to support any public school not under exclusive public control. This allegation of an unconstitutional expenditure of public funds, which must be taken as true for the purposes of the defendants’ motions to dismiss, is sufficient to confer standing on plaintiffs under the expenditure prong of the ten taxpayer statute. The defendants have not demonstrated that the plaintiffs can prove no set of facts in support of this claim.
Contrary to the defendants’ assertion, Pratt does not stand for the proposition that spending already budgeted funds does not constitute spending money. Rather, the Court intimated that the statute envisions the expenditure of large sums of money. The Court did not set forth its analysis, but simply concluded that the plaintiffs had “not made a showing of their standing under the expenditure prong of G.L.c. 40 §53.” Id. at 44. In the present case, it is beyond dispute that substantial expenditures are at issue.
The defendants’ argument that the School Committee is not a proper party to a ten taxpayer suit is also unavailing. School committees have consistently been sued under this statute. See Bloom v. School Committee of Springfield, 376 Mass. 35 (1978); Dowd v. Town of Dover, 334 Mass. 23 (1956); Wilson v. Brouder, 291 Mass. 389; Leonard v. School Committee of City of Springfield, 241 Mass. 325 (1922). The defendants are correct in noting that the issue of jurisdiction was not raised in the above cases. However, defendants fail to note that subject matter jurisdiction cannot be conferred by consent, conduct, or waiver, and may be raised by any party or by the court at any time.
*359 3.Transitional Bilingual Education Act
The next issue the court must consider is whether the Transitional Bilingual Education Act (“TBEA”) provides a private right of action. This issue was not raised in the parties’ prior motions to dismiss. The defendants allege that there is no private right of action under TBEA because the statute does not expressly provide for one, or demonstrate a clear legislative intent to provide a private person with a right of action. The defendants further contend that due to the repeal of G.L.c. 71 A, §8, underfunding of bilingual education does not violate G.L.c. 71A, or its regulations.
Plaintiffs ask the court to imply a private cause of action under the statute, alleging that the statute evidences special legislative concern for a class of people of which plaintiffs are members. Plaintiffs also allege that based upon G.L.c. 70, §2A, G.L.c. 70A (Chapter 188 of the Acts of 1985), and 603 C.M.R. §14.04(6), underfunding of bilingual education violates TBEA.
It is undisputed that TBEA does not expressly provide a private right of action. However, “(w]here a statutory right is conferred upon a class of individuals as distinguished from the public at large but no remedy is provided by the statute for the enforcement of the right, the right may be asserted by any appropriate common law remedy available. ” Gabriel v. Borowy, 324 Mass. 231, 234 (1949) (citations omitted). See Sturdy v. Planning Board of Hingham, 32 Mass.App.Ct. 72, 78 (1992) (“There appears to be no special legislative concern for an identifiable interest of a group of which the plaintiff is a member but rather a concern for travelers and the public generally”); Ludlow Education Association v. Ludlow, 31 Mass.App.Ct. 110, 119 (1991).
In the present case, the court is not persuaded that TBEA evidences sufficient legislative concern to imply a private right of action. Plaintiffs rely upon the Declaration of Policy accompanying the statute as evidence of the Legislature’s concern. While that declaration certainly shows a legislative appreciation for the needs of bilingual students, it must be read in light of subsequent legislative enactments. The court refers specifically to the repeal of G.L.c. 71A, §8, which formerly provided in relevant part:
Nothing herein shall be interpreted to authorize cities, towns or school districts to reduce expenditures from local and federal sources, including monies allocated under the federal elementary and Secondary Education Act, for transitional bilingual education programs.
The repeal of the above section weighs heavily against implying a private right of action. General Laws c. 70, §2A and c. 70A (chapter 188 of the Acts of 1985) do not support plaintiffs’ claim.
Plaintiffs correctly note that 603 C.M.R. §14.04(6) is still in force. That regulation provides in relevant part, “(n]o school district shall decrease the level of local expenditure devoted to programs in Transitional Bilingual Education . . .” However, this regulation is insufficient, in and of itself, to demonstrate legislative concern sufficient to imply a private right of action. Furthermore, G.L.c. 71, §34 explicitly sets forth the authority of school committees to determine expenditures within total appropriations. Based on the foregoing, the plaintiffs’ claim under the Transitional Bilingual Education Act must be dismissed.
4.G.L.c. 231A
Defendants allege that the plaintiffs incorrectly attempt to rely upon G.L.c. 231A as a statutory basis for standing. The defendants’ contention is erroneous. Plaintiffs assert jurisdiction under G.L.c. 40, §53, and properly seek declaratory relief pursuant to G.L.c. 231A.[6]
5.G.L.c. 71, §34
Defendants allege that the repeal of G.L.c. 71, §34, precludes a ten taxpayer petition to challenge all funding decisions regarding public education. The statute as formerly promulgated authorized a ten taxpayer petition to compel an increase in the annual budget appropriations for the support of public schools. As mentioned above, in its current form, the statute gives school committees the authority to determine expenditures within total appropriations. This authority is subject, however, to constitutional limitations and does not authorize school committees to act carte blanche.
IV. Motions for Summary Judgment
A. Standard
Summaiy judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
*360 Where both parties have moved for summaiy judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summaiy judgment shall be granted to the party entitled to judgment as a matter of law. See Cassesso, supra at 422.
B. Primary Claims
1. Anti-Aid Amendment
Plaintiffs allege that the Contract and Enabling Act violate the anti-aid amendment to the Massachusetts Constitution. The anti-aid amendment provides in relevant part:
No grant, appropriation or use of public money . . . shall be made or authorized by the commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any. . . primary or secondary school... which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents . . . Mass. Const. Art. Amend. 18, §2. (emphasis added).
The plaintiffs contend that this amendment has been violated because BU, a private educational institution, now controls the Chelsea public schools.
BU presents three arguments in opposition to the plaintiffs’ anti-aid amendment challenge: (1) the School Committee, not BU, controls the Chelsea public schools; (2) the Contract and Enabling Act pass the three part anti-aid amendment test; and (3) even if BU does control the Chelsea public schools, it does so as a public agent authorized by the Commonwealth.
After consideration, the court concludes that BU is a public agent. The court recognizes that whether BU is a public agent would seem to be a disputed issue of fact. However, it is undisputed that both the governor of Massachusetts and the General Court approved BU’s role in the Chelsea public school system. Express authorization by both the Executive and Legislative branches of the state government suffices to establish BU as a public agent. Because BU is a public agent, the Contract and Enabling Act do not violate the anti-aid amendment to the Massachusetts Constitution.[7] See also G.L.c. 71, §89 (under the Education Reform Act of 1993, the Boards of Trustees of charter schools deemed to be public agents authorized by the Commonwealth).
2. Delegation of Power
The plaintiffs allege that because the Enabling Act authorized the School Committee to delegate some or all of its legal duties, powers, and functions to BU (Enabling Act, §3), the delegation is unconstitutional under Pt. 1, articles 1, 5, and 10; Pt. 2, ch. 1, §1; art. 4, and Art. 30 of the Massachusetts Constitution.
Pt. 1, Art. 1 provides:
All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness.
Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.
Pt. 1, Art. 5 provides:
All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them.
Pt. 1, Art. 10 provides in relevant part:
Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws ... In fine, the people of this commonwealth are not controllable by any other laws than those to which their constitutional representative body have given their consent.
Pt. 2, C. 1, §1, Art. 4 provides:
And further, full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this commonwealth, and for the government and ordering thereof, and of the subjects of the same, and for the necessary support and defence of the government thereof; and to name and settle annually, or provide by fixed laws, for the naming and settling all civil officers within the said commonwealth; the election and constitution of whom are not hereafter in this form of government otherwise provided for; and to set forth the several duties, powers, and limits, of the several civil and military officers of this commonwealth, and the forms of such oaths or affirmations as shall be respectively administered unto them for the execution of their several offices and places, so as the same be not repugnant or contrary to this constitution; and to impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth; and also to impose and levy, reasonable duties and excises, upon any produce, goods, wares, merchandise, and commodities, whatsoever, brought into, produced, manufactured, or being within the same; to be issued and disposed of by warrant, under the hand of the governor of this commonwealth for the time being, with the advice and consent of the council, for the public service, in the necessary defence and support of the government of the said commonwealth, and the protection and preservation of the subjects thereof, according to such acts as are or shall be in force within the same.
And while the public charges of government, or any part thereof, shall be assessed on polls and estates, *361 in the manner that has hitherto been practised [sic], in order that such assessments may be made with equality, there shall be a valuation of estates within the commonwealth taken anew once in every ten years at least, and as much oftener as the general court shall order.
Art. 30 provides:
In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.
BU alleges that this claim is foreclosed by the Supreme Judicial Court’s decision in Powers v. Secretary of Administration, 412 Mass. 119 (1992), in which the Court ruled that the act which established a receivership for the city of Chelsea did not constitute an unconstitutional delegation of power. The Court utilized a three-part test in analyzing that delegation, and declared it constitutional primarily because the Court found that the Legislature had made the fundamental policy decision regarding the then existing crisis in the city of Chelsea, and had delegated to the Receiver only the implementation of that policy.
BU contends that the Legislature has in this case made the fundamental policy decision regarding the poor condition of the Chelsea public school system, and left implementation of that policy to BU. It thus alleges that under Powers, the delegation was constitutional.
The plaintiffs allege that BU’s reliance on Powers is misplaced because there the nondelegation doctrine was the sole constitutional limit on the Legislature’s authority, while in the present case, the anti-aid amendment is an independent limitation. The plaintiffs also claim that under School Committee of Hanover v. Curry, 3 Mass.App.Ct. 151 (1975), “the power and responsibility of School Committees to manage public education cannot be delegated to a private entity because of the necessity of safeguarding public control over public education.”
As a preliminary matter, the court notes that the plaintiffs may not base an unconstitutional delegation claim on Pt. 1, article 5 of the Massachusetts Constitution. See Arlington v. Board of Conciliation & Arbitration, 370 Mass. 769, 775 (1976). After consideration of all the arguments, the court concludes that the delegation issue must be analyzed under the three-part test employed in Powers. The plaintiffs’ claim that the anti-aid amendment operates as an independent limitation on the Legislature’s power to delegate is unavailing, as this court has already ruled that BU is a public agent for anti-aid amendment purposes. Hanover, and the other cases cited by plaintiffs do not warrant a different conclusion.
In Powers, the Court reiterated the well established principle “that the ‘legislature may delegate to a board or officer the working out of the details of a policy adopted by the legislature.’ ” 412 Mass. at 127. (citations omitted). The Court set forth a three-part test for examining the propriety of a delegation:
(1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislative determined policy: (2) does the Act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?
Id., quoting Chelmsford Trailer Park, Inc. v. Chelmsford, 393 Mass. 186, 190 (1984).
In the present case, it is beyond dispute that the Legislature made a fundamental policy decision that the Chelsea public schools offered “unacceptably low levels of educational opportunity,” Enabling Act, Section 2, and that this crisis would best be remedied with the assistance of BU. In fact, Section 4 of the Enabling Act specifically admonishes BU to use its “best efforts to implement, during the term of any agreement entered into pursuant to said section three, the policy goals, purposes and objectives of this act...” (emphasis added).
The Enabling Act also provides adequate direction to BU as to how to implement the Legislature’s policy regarding the Chelsea schools. Section 4 directs BU toward:
revitalizing the curriculum of the school system to increase the rigor and breadth of the courses of instruction, including practice in organizing, integrating and applying knowledge with an emphasis on reasoning, mastery of content and problem-solving: to establish programs of professional development for school personnel and to provide learning opportunities for parents; to improve test scores of students in the school system, especially the scores for each school and the system as a whole in the elementary grades in reading, writing and mathematics; to decrease the dropout rate; to increase the average daily student attendance rate; to increase the number of high school graduates; to increase the number of high school graduates going on to attend four-year colleges; to increase the number of job placements for graduates; to develop a community school program through which before-school, after-school and summer programs are offered to students in the school system and adult education classes for inhabitants of the city; to identify and encourage the utilization of community resources; to establish programs which link the homes to the schools; to decrease teacher absenteeism; to improve the financial management of the school system and expand the range of operating *362 funds available to the school system; to increase salaries and benefits for all staff, including raising the teacher salary average to make it competitive with the statewide average; to construct effective recruiting, hiring and retention procedures for staff members; to establish student assessment designs and procedures which are of assistance in monitoring programs and which act as incentives for staff members in each school; and to expand and modernize physical facilities in the school system.
The foregoing directives provide sufficient guidance to ensure that BU “will exercise its authority in conformity with the fundamental policies underlying the Act." Powers, supra at 129.
The Enabling Act also includes ample safeguards to control any potential abuses of discretion. For example, Section 4 requires BU to make periodic detailed progress reports to the School Committee, the Mayor, and the Aldermen. Under Section 5, any expenditure by BU of public funds received by the city in accordance with G.L.c. 44, §§53 and 54 is subject to scrutiny by the Inspector General under G.L.c. 12A, whose purpose is “to prevent and detect fraud, waste and abuse in the expenditure of public funds . . .” G.L.c. 12A, §7. Under Section 6, BU is subject to the open meeting law, G.L.c. 39, to the same extent the School Committee would be on similar decisions. Section 13 of the Enabling Act mandates a highly detailed progress report to the General Court on September 1 oí each year. The report must also be filed simultaneously with the state board of education and with the School Committee. Finally, pursuant to both the Contract, Clause (H)(3), and Enabling Act, §3, the School Committee may terminate the Contract at any time, without cause. Based on the foregoing, the court concludes that under the test set forth in Powers, the delegation is constitutional.[8]
Although the court finds that the Enabling Act survives a facial constitutional attack, there remains the issue of plaintiffs' “as applied" challenge.[9] The Powers court considered only a facial constitutional attack on the Chelsea Receivership Act. It declined to address whether any specific action of the Receiver was invalid as applied. Powers, supra at 127.
In the present case, the plaintiffs have set forth an “as applied” challenge to the BU-Chelsea arrangement. They generally allege that BU is not adequately informing the School Committee of the status of the school system, and that the School Committee’s authority to seek reconsideration on certain actions of BU is illusoiy.
Resolution of the plaintiffs’ “as applied” challenge is ultimately one for the trier of fact. Summary judgment is therefore inappropriate on this portion of plaintiffs’ unconstitutional delegation claim.
3. Home Rule Amendment, Section 1
Plaintiffs have also alleged a violation of the Home Rule Amendment, Mass. Const. Art. Amend. 2, §1, which provides:
It is the intention of this article to reaffirm the customary and traditional liberties of the people with respect to the conduct of their local government, and to grant and confirm to the people of every city and town the right of self-government in local matters, subject to the provision of this article and to such standards and requirements as the general court may establish by law in accordance with the provisions of this article (emphasis added).
They claim that the takeover “is in derogation of the customary and traditional liberty of the people of Chelsea to control the public education of their children, guaranteed in the Education Clause[10] and Anti-Aid Amendment.”
After consideration, the court concludes that the plaintiffs’ Home Rule Amendment challenge must fail. First, as stated above, there is no violation of the anti-aid amendment. Second, as the plaintiffs concede at page 4 of their Reply Brief, “the Education Clause is silent on the issue of control of public education.”[11]
4. Home Rule Amendment, Section 8
The plaintiffs’ next claim is that the procedure by which the home rule petition and enabling legislation were passed violate Section 8 of the Home Rule Amendment; the Mass. Const., Part I, Art. 19;[12] the Chelsea City Charter; and the Rules and Regulations of the Chelsea School Committee. The essence of the plaintiffs’ claim is that the Contract was never legally approved by the School Committee.
The plaintiffs allege that the School Committee’s request to the Aldermen to initiate the home rule petition violated Section 7 of the Rules and Regulations of the Chelsea School Committee, which they claim provided that the regulations may only be amended by a two-thirds vote of the full School Committee, provided that each member has prior written notice of the proposed amendment(s), and that the proposed regulations lay on the table for at least 30 days.[13] The plaintiffs allege that the School Committee’s vote substantially amended its rules and regulations, but that the foregoing procedure was not followed, thereby invalidating the School Committee’s home rule action request. Plaintiffs also allege that neither the Aldermen nor the mayor had independent power to initiate the home rule petition.
BU alleges that Section 8 does not contemplate participation by the School Committee and that any error in the prior steps is irrelevant. It also alleges that the School Committee’s vote was not intended to amend its rules, and even if the vote failed to amend the rules, it would nevertheless be effective as to its other purpose — to request home rule action from the Aldermen, which request does not require a super-majority (two-thirds) vote of the School Committee.
Plaintiffs’ claim must fail for one primary reason— that the School Committee did not vote to amend its rules.[14] Section 7 contemplates that once its require *363 ments are met, the rules are immediately amended. In the current case, the School Committee did not have before it a specific proposal to amend any rule, and its vote did not result in an immediate rule change. The purpose of the School Committee vote was only to put the issue of the Contract before the Legislature. Essentially, the School Committee’s vote was a vote on whether to allow the Legislature to vote on the proposed contract. Section 7 is inapplicable to this scenario.
5.Equal Protection of Citizens of Chelsea
Plaintiffs’ next claim is that the “takeover” violated the equal protection clause of the state constitution.[15] The plaintiffs’ briefs on this issue are somewhat confusing, as they have not clearly delineated the nature of their equal protection claim. The plaintiffs refer, at various time, to the right of political self-government, the right of the citizens of Chelsea to exclusively control their children’s public school education; the fundamental right of public education under the Massachusetts Constitution; the constitutional right to be educated in public schools; and the Education/Cherish the Interests Clause and anti-aid amendment’s explicit guarantee of the fundamental right to publicly controlled education in Massachusetts. The plaintiffs also claim that the Chelsea public schools are no longer public because they are no longer under exclusive public control.
Based on a review of the plaintiffs’ submissions, it is apparent that the crux of their equal protection claim is that education is a fundamental right under the Massachusetts Constitution, and that limiting public control over public education touches on that fundamental right, and is therefore subject to strict scrutiny.[16] Plaintiffs allege that the BU-Chelsea agreement will not withstand strict scrutiny, or in the alternative, rational basis scrutiny. They allege that the “takeover" must be found unconstitutional under either standard of review.
Plaintiffs allege, citing Shapiro v. Thompson, 394 U.S. 618, 634 (1968), that because the BU-Chelsea agreement “touches” on the fundamental right to public education, it is subject to strict scrutiny. Plaintiffs are incorrect in this assertion. In order to subject the BU-Chelsea agreement to strict scrutiny, the plaintiffs must show that the agreement somehow penalizes the exercise of the alleged fundamental right to public education. Id. (emphasis added). The gravamen of the plaintiffs’ claim is not that the right of the Chelsea schoolchildren to receive an education is being impinged,[17] but that there is insufficient public control over that education.
Plaintiffs are not entitled to strict scrutiny on their public control allegation. There is no fundamental right to exclusive public control over public education. Plaintiffs’ Education/Cherish the Interests Clause, anti-aid amendment merger does not provide such a right; McDuffy does not declare such a right; there is no such right. As the Supreme Judicial Court made abundantly clear in McDuffy, “At all times . . . the ultimate responsibility for educating the public belongs to the ‘legislatures and magistrates.’ ”415 Mass. at 611.
Because exclusive public control over public education is not a fundamental right, the court will review the BU-Chelsea agreement under the rational basis test, which is the lowest level of judicial scrutiny. See Take Five Vending, Ltd. v. Provincetown, 415 Mass. 741, 748 (1993). “In applying the rational basis standard, [the Supreme Judicial Court has] stated that ‘[i]f a statute or ordinance serves a legitimate purpose, and if the means the State adopted are rationally related to the achievement of that purpose, the legislation will withstand constitutional challenge’ (footnote omitted). Shell Oil Co. v. Revere, 383 Mass. 682, 686 (1981).” Id.
In the present case, the Legislature has determined that the quality of education available in the Chelsea public schools fell far below the level that the Legislature deemed acceptable. In an attempt to rectify the problem, the Legislature, as well as the governor, authorized BU’s involvement. That decision was rationally related to the its legitimate interest in ensuring that children receive an education. See McDuffy, supra at 620 (“Thus, we leave it to the magistrates and the Legislatures to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children . . .”).
6.Due Process Rights of Chelsea Teachers
The essence of this claim is that by substituting BU for the School Committee with respect to pre-termination hearings, the Contract and Enabling Act unconstitutionally abrogate the tenure rights of the Chelsea teachers. In light of the Education Reform Act of 1993, which abolished both tenure and pre-termination hearing rights, this claim must fail.
Even though the plaintiffs’ procedural due process claims are foreclosed by the Education Reform Act of 1993, the courtnotes that the EnablingAct specifically provides for the protection of due process rights. Section 10 provides: “... the contract shall subject the university to the procedural requirements associated with employee rights . . . otherwise applicable to the school committee including, without limitation, notice and hearing requirements.” (Emphasis added.)
7.Exemption from Statutes
Plaintiffs allege that the Contract and Enabling Act exempt BU from a variety of statutes in violation of Mass. Const., Part I, Article 5. Plaintiffs allege that BU is unlawfully exempt from those statutes regarding (a) open meetings, G.L.c. 39, §§23A-C; (b) public records, G.L.c. 66, §10; (c) personnel records, G.L.c. 149, §52C; (d) collective bargaining, G.L.c. 150E, §10(a); (e) tort liability and indemnification; and (f) public audits, G.L.c. 12 A.
*364 After examining the alleged “exemptions” in light of the language of the Contract and Enabling Act, the court concludes that plaintiffs’ claims must fail as a matter of law. The Enabling Act sufficiently preserves public accountability.
C. Conclusion
By this decision, all of the issues raised by the 51 Hispanic plaintiffs (No. 90-7273-D) have been addressed and resolved in favor of the defendants. Of the issues raised by the Devlin plaintiffs (No. 88-6634-D), all but the “as applied” unconstitutional delegation (Devlin plaintiffs’ Supplement to Complaint, ¶¶27-30) claim have been resolved in favor of the defendants. The “as applied” claim will be held for trial.
ORDER
For the foregoing reasons, the court ORDERS as follows:
A. The motion to dismiss of defendant School Committee of the City of Chelsea, joined in by defendant Trustees of Boston University, is ALLOWED as to defendants’ alleged violation of the Transitional Bilingual Education Act, and DENIED as to the remaining claims;
B. The motion for summary judgment of defendant Trustees of Boston University, joined in by defendant School Committee of the City of Chelsea, is ALLOWED as to all claims except the Devlin plaintiffs’ “as applied” unconstitutional delegation claim (Devlin plaintiffs’ Supplement to Complaint, ¶¶27-30); and
C. The cross-motion for summary judgment of the Devlin plaintiffs and 51 Hispanic plaintiffs is DENIED as to all claims.

 Chelsea went into receivership in 1991.

 There appears to be some confusion as to the order in which the Substituted Amended Complaint and the one-count complaint were drafted. The Substituted Amended Complaint is dated July 27, 1990. The complaint filed in the Superior Court on April 16, 1991, is dated April 15, 1990. Although the subsequently filed Superior Court complaint appears to pre-date the Substituted Amended Complaint, it is likely that the April 15, 1990 date is a typographical error and that April 15, 1991 is the correct date.

 As a practical matter, this result would have little impact on this action, as most of the claims (and all of the primary claims as litigated by the parties) the 51 Hispanic plaintiffs dropped would remain before this court in the Devlin plaintiffs Complaint and Supplement to Complaint.

 See letter from Paul D. Wilson to Hon. Walter Steele, dated February 7, 1989.

 Plaintiffs do not cite a specific section of this statute. The court must therefore assume that plaintiffs rely on this statute as an appeal to this court’s equitable powers.

 Defendants have neither pursued nor cited any authority in support of their argument that there is no jurisdiction under G.L.c. 231A to render a declaratory judgment about the constitutionality of proposed legislation, and the court does not consider this argument further.

 In light of this finding, the court does not consider the remaining anti-aid amendment arguments of the parties.

 The court is unpersuaded by plaintiffs’ arguments that the Enabling Act fails to meet the test set forth in Powers, and declines to separately address each argument.

 The parties have hotly contested whether the plaintiffs have in fact set forth an “as applied” challenge. After examining the pleadings, the court concludes that the plaintiffs have stated such a challenge. See Devlin Plaintiffs’ Supplement to Complaint, ¶¶27-30.

 The “Education Clause” plaintiffs refer to in their briefs is also known as the “Cherish the Interests Clause.” This clause provides in relevant part:
Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties ... it shall be the duty of legislatures and magistrates, in all future periods of this commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the universily at Cambridge, public schools and grammar schools in the towns . . .
(Emphasis added.) Mass. Const., Part II, c. 5, §2.

 The decision of the Supreme Judicial Court in McDuffy v. Secretary of the Executive Office of Education, 415 Mass. 545 (1993), contains an excellent discussion of the history of the Education/Cherish the Interests Clause, but does not otherwise affect the outcome of plaintiffs’ Home Rule Amendment claim.

 Mass. Const. Part I, Art. 19 provides:
The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer.

 Plaintiffs have not appended a copy of the Rules and Regulations of the Chelsea School Committee to their summary judgment papers, nor have they provided the court with a copy of the Chelsea City Charger on which they rely.

 The court will assume, for the present purposes, that Section 7 of the Rules and Regulations of the Chelsea'School Committee is consistent with plaintiffs’ representation.

 Plaintiffs have not pursued their claim that education is a fundamental right under the United States Constitution, which, of course, it is not. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 38-40 (1973).

 Plaintiffs’ allegation that they have a fundamental right to political self-government is without merit. See Powers, supra at 129-30 (the Legislature may provide an appointive, rather than elective form of municipal government).

 The court need not decide whether education is a fundamental right under the Massachusetts Constitution, although it appears so under McDuffy.