CHELMSFORD TRAILER PARK, INC. *vs.* TOWN OF
CHELMSFORD & others.[1]

Suffolk.  June 4, 1984. — October 25, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Constitutional Law,* Delegation of powers, Separation of powers, Ex post
facto law. *Rent Control. Municipal Corporations,* Rent control, Munic-
ipal regulation. *Statute,* Construction. *Chelmsford.*

It was held that St. 1983, c. 449, enabling the town of Chelmsford to adopt a
by-law to control rents and evictions in mobile home parks was a proper
delegation of legislative authority despite claims by the owner of a
mobile home park that the act was deficient in that it provided no
timetable for the rent board to act on rent adjustments or evictions,
included no list of reasons for which eviction is permitted, and did not
give adequate guidance to the rent board regarding applications for rent
adjustments. [189-194]

Section 7 of St. 1983, c. 449, providing that the rent board of the town of
Chelmsford "may regulate evictions of tenants at mobile home parks
and may issue orders which shall be a defense to an action of summary
process for possession," did not violate the separation of powers require-
ment under art. 30 of the Massachusetts Declaration of Rights. [194-196]

Language in St. 1983, c. 449, § 6 (1), reading that the rent board of the town
of Chelmsford "may make individual or general adjustments . . . to
assure that tenants for mobile home park accommodations are established
on levels which yield to owners a fair net operating income for such
units," containing a clear error, was treated as including the word "rents"
either in place of, or immediately following, the word "tenants."
[196-197]

Rent control legislation containing a six-month "rollback" provision did not
amount to an unconstitutional ex post facto law. [197-198]

CIVIL ACTION commenced in the Superior Court Department
on March 12, 1984.

---

[1] The other defendants are the board of selectmen of Chelmsford, the
town clerk of Chelmsford, the board of health of Chelmsford, Chelmsford
Mobile Home Park Tenants Association, Inc., and tenants at the Chelmsford
Mobile Home Park.

A motion for a preliminary injunction was heard by *Jeremiah Sullivan, J.*, sitting under statutory authority. Upon transfer to the Supreme Judicial Court for the county of Suffolk, the case was reported by *Nolan, J.*

*Peter B. Sessa* for Chelmsford Mobile Home Park Tenants Association, Inc. (*James M. Harrington* for the town of Chelmsford & others, with him).

*Vincent R. Brogna* (*Edward H. London* with him) for the plaintiff.

*Richard C. Allen*, Assistant Attorney General, for the Attorney General, joined in a brief.

LYNCH, J. The plaintiff, the owner of a mobile home park, challenges the validity of St. 1983, c. 449 (the act), an act enabling the town of Chelmsford to adopt a by-law to control rents and evictions in mobile home parks, and the validity of the by-law adopted by the town pursuant to the act.

The owner's complaint sought a declaratory judgment that the act and the by-law were invalid and unconstitutional, as well as preliminary and permanent injunctions against the implementation of the by-law by the town. The Attorney General intervened as a party defendant pursuant to G. L. c. 231A, § 8. On April 9, 1984, a judge in the Superior Court granted the preliminary injunction sought by the owner. On May 3, 1984, a Justice of this court transferred the case from the Superior Court to the Supreme Judicial Court for Suffolk County pursuant to G. L. c. 211, § 4A, and the parties filed a statement of agreed facts. On May 14, the case was reserved and reported without decision to the full court. The parties waived oral argument on the issues, but on June 4, 1984, presented argument on a motion of the tenants' association and the town, assented to by the Attorney General, that the court vacate the injunction against implementation of the by-law. That motion was denied on June 5, 1984. We conclude that both the by-law and the enabling act are constitutional and enforceable.

The plaintiff is a corporation owning approximately thirty-eight acres of land in the town and licensed pursuant to G. L. c. 140, § 32B, to operate and to do business as a mobile home park. There is no other mobile home park licensed by the town. The Chelmsford Mobile Home Park has approximately 600

residents, with space for 254 mobile homes. Park residents own their mobile homes. For a monthly fee, the owner provides the land for the homes, connections for water and sewerage pipes and electrical services, and various other services, such as rubbish disposal, road maintenance and plowing, outside lighting and general maintenance.

At a special town meeting on May 16, 1983, the town voted to petition the Legislature for enabling legislation that would permit the town to adopt a rent and eviction control by-law. Pursuant to that vote, a home rule petition was filed with the Legislature and on or about October 27, 1983, the act was signed into law. In January, 1984, a special town meeting adopted a by-law implementing the provisions of the act.

1. *The act and the by-law.* Although it is not identical in every particular with rent control acts previously enacted in the Commonwealth,[2] the act is similar to those other laws in substance, language, and tone. Section 1 is a declaration of public emergency by the Legislature, "which emergency has been created by excessive, abnormally high and unwarranted rental increases imposed by some[3] owners of mobile home parks." Section 2 authorizes the town to adopt as a town by-law the subsequent sections. Section 3 is a definitional section, not materially different from parallel sections in other rent control statutes, and not at issue here. Section 4 establishes a mobile home park rent control board (rent board) consisting of five residents of the town to be appointed by the board of selectmen. Section 5 directs the rent board to "set maximum rents, set minimum standards for use or occupancy of mobile home parks and evictions of tenants therefrom" and empowers the rent board to "make rules and regulations, sue and be sued, compel attendance of persons and the production of papers and information, and issue appropriate orders which shall be binding on both the owner and tenants . . . ." Section 6 concerns

---

[2] See, e.g., St. 1970, c. 842 (State Enabling Act); St. 1970, c. 843 (Brookline); St. 1976, c. 36 (Cambridge); St. 1976, c. 37 (Somerville); St. 1976, c. 131 (Peabody [mobile home parks]).

[3] The plaintiff is the only owner of a mobile home park in Chelmsford. In our view nothing turns on this distinction.

individual and general rent adjustments and is set out in full in the margin.[4] Section 7 states that "[t]he Board may regulate evictions of tenants at mobile home parks and may issue orders which shall be a defense to an action of summary process for possession." Section 8 establishes that the rent board is subject to the provisions of G. L. c. 30A as if it were an agency of the Commonwealth, and jurisdiction of all petitions for review is vested in the Lowell Division of the District Court and in the Superior Court. Section 9 limits initially the monthly rent of a mobile home lot to the rent charged the occupant six months prior to the adoption of the by-law by the town meeting. A fine of not more than $1,000 for any one offense is authorized by § 10. Section 11 is a severability clause.

The by-law adopted the language of the act verbatim, with a slight change in the wording of § 2, which in the by-law states: "The Town of Chelmsford hereby adopts the following nine sections as a Town by-law which shall be known and may be cited as the 'Mobile Home Rent Control By-law.'"

2. *Delegation of legislative authority.* The main thrust of the owner's argument is that the act is an unlawful delegation of legislative authority to the rent board because it fails to delineate sufficiently specific guidelines, standards, and procedures for the application of the by-law by the board. Although the act is less detailed than rent control laws referred to by the owner, it nevertheless provides sufficient direction to enable

---

[4] Statute 1983, c. 449, § 6, provides: "(1) The Board may make individual or general adjustments, either upward or downward, as may be necessary to assure that tenants [*sic*] for mobile home park accommodations are established on levels which yield to owners a fair net operating income for such units.

"(2) Fair net operating income shall be that income which will yield a return, after all reasonable operating expenses, on the fair market value of the property, equal to the debt service rate generally available from institutional first mortgage lenders or such other rates of return as the Board, on the basis of evidence presented before it, deems more appropriate to the circumstances of the case.

"(3) Fair market value shall be the assessed valuation of the property or such other valuation as the Board, on the basis of evidence presented before it, deems more appropriate to the circumstances of the case.

"(4) The Board may establish further standards and rules consistent with the foregoing."

the rent board to implement its policies and sufficient safeguards to protect against arbitrary action or abuse of discretion.

The owner has identified three areas of the act in which it argues there are insufficiently detailed standards. We shall address each one separately, but a few general comments about delegation of legislative authority will help focus the individual analyses.

Provided that the policy and purpose of the Legislature are clearly expressed, the absence of detailed standards in the legislation itself will not necessarily render it invalid as an unlawful delegation of legislative authority. "The standards for action to carry out a declared legislative policy may be found not only in the express provisions of an act but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature." *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 544 (1965). This principle applies equally in the area of rent control legislation. "Having adopted a policy of rent control by this emergency legislation [the Legislature] may also delegate to the cities and towns as governmental agencies the administration of its details in respect to matters peculiarly affecting local interests." *Russell* v. *Treasurer & Receiver Gen.,* 331 Mass. 501, 507 (1954).

No formula exists for determining whether a delegation of legislative authority is "proper" or not. Here, in order to make that determination, we undertake a threefold analysis: (1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled? We examine the three aspects of the act which, the owner argues, contain an improper delegation of legislative authority.

a. *Procedural requirements*. The act does not provide a timetable for the rent board to act on rent adjustments or evictions. Neither do any of the other rent control acts upheld by this court. The rent board has not had the opportunity to develop any working rules nor to demonstrate how quickly or slowly it will work. The owner cites *Carson Mobile Home Park Owners' Ass'n* v. *Carson,* 35 Cal. 3d 184 (1983), as suggesting that time constraints are required. No such message can be found in that case, however. There a rent control ordinance set a total of 105 days for the rent control board to act on a rent increase application. In upholding the act, the court did not suggest that this or any other time limit was required. In the absence of evidence to the contrary, it is to be presumed that the rent board will act in a reasonable and timely manner.

b. *Eviction provisions*. Section 7 of the act states that "[t]he Board may regulate evictions of tenants at mobile home parks and may issue orders which shall be a defense to an action of summary process for possession." It does not include, as do some other rent control acts, a list of reasons for which an owner is permitted to bring an eviction action. See, e.g., St. 1976, c. 37, § 8 (Somerville).[5] Because of the absence of this list, the owner argues, the rent board has unbridled power to regulate evictions, and can be subject to no meaningful review. No such result follows.

In *Grace* v. *Brookline,* 379 Mass. 43, 49 (1979), this court acknowledged that cities and towns which have adopted a policy of rent control may regulate evictions of tenants. The act upheld in *Grace, supra* at 45-46 & n.8 (St. 1970, c. 843), did not include a list of reasons justifying eviction.

It does not follow, as the owner contends, that the rent board has no standards whatsoever to guide it in reviewing applications for eviction. In addition to G. L. c. 239, which governs summary process generally, the board should also look to G. L.

---

[5] It is worth noting that in addition to nine specific reasons for which a tenant can be evicted, this list invariably includes the catch-all "for any other just cause, provided that the purpose is not in conflict with the provisions and purposes of this act." Thus, rent boards retain a significant measure of discretion, despite any guidelines in the statute.

c. 140, § 32J, which deals specifically and exclusively with evictions of tenants in a mobile home park.[6] The eviction certificate procedure of the board could not alter the system of summary process under G. L. c. 239 and G. L. c. 140, § 32J. "[I]ndividual statutory provisions related to the same general area must be read 'as a whole . . . to the end that, as far as possible, the [entire legislative program] will constitute a consistent and harmonious whole.' " *Jones* v. *Wayland,* 380 Mass. 110, 118 (1980), quoting *Haines* v. *Town Manager of Mansfield,* 320 Mass. 140, 142 (1946). It is clear, therefore, that the rent board may only act on applications to evict mobile home tenants in a manner consistent with generally established limitations and procedures.

c. *Adjustment of rents.* Finally, the owner argues that the act provides inadequate guidance to the rent board regarding applications for rent adjustments. The owner relies upon the absence of the phrase "remove hardships or correct inequities," which appears in several, although not all, of the other rent control acts.[7] Nothing turns on the absence of this language. It is at best a statement of policy, and would provide no concrete assistance to a rent board faced with an application for adjustment. "Nothing should hinge upon presence or absence of such

---

[6] General Laws c. 140, § 32J, as amended through St. 1975, c. 692, states that tenancy in a mobile home park may be terminated only for one or more of four reasons: "(1) nonpayment of rent. (2) substantial violation of any enforceable rule of the mobile home park. (3) violation of any laws or ordinances which protect the health or safety of other mobile home park residents. (4) a discontinuance in good faith by the licensee, of the use of part or all of the land owned by the licensee as a mobile home park subject to any existing contractual rights or agreements between the licensee and the *tenants* located in the mobile home park" (emphasis supplied).

The owner argues that § 32J concerns "terminations of tenancies" as distinguished from evictions. In *Commonwealth* v. *Gustafsson,* 370 Mass. 181, 185 (1976), § 32J was characterized as a statute "which pertains to evictions." In *Liberty Mobilehome Sales, Inc.* v. *Bernard,* 6 Mass. App. Ct. 914, 915 (1978), the Appeals Court stated that § 32J "regulates evictions from mobile home parks."

[7] See, e.g., St. 1970, c. 843, § 2 (Brookline), and St. 1976, c. 131, § 2 (Peabody), which include this phrase, and St. 1970, c. 842 (State enabling act), St. 1976, c. 36 (Cambridge), and St. 1976, c. 37 (Somerville), which do not.

vague phrases as 'public interest' or 'just and reasonable.'"
1 K.C. Davis, Administrative Law § 3.5, at 160 (2d ed. 1978).

What the act does provide is that whatever adjustments are
made must assure that the owner will receive a "fair net operat-
ing income." St. 1983, c. 449, § 6. "Fair net operating income"
is that income, after expenses, which will yield a return on
the fair market value of the property equal to the generally
available debt service rate or such other rate as the board deems
appropriate. Identical language has been interpreted as requir-
ing that rent be set so as to assure a "reasonable return on the
fair value of the landlord's investment." *Marshal House, Inc.*
v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 705 (1971).
There the court compared the rent adjustment provisions of
St. 1970, c. 842 (State enabling act), and St. 1970, c. 843.
Both acts required rents to be set so as to yield landlords a
"fair net operating income." Chapter 843 defined the term (as
precisely as it is defined in the Chelmsford act). Chapter 842
provided no definition but instead listed six relevant factors
which were to be considered in determining what constitutes
fair net operating income. *Id.* at 702. The court found that
both formulations were acceptable. "Neither . . . is inflexible
enough to require a result more or less advantageous to land-
lords than the other. The lack of a list of relevant factors in
c. 843 in no way precludes the administrator under that act
from considering them; nor is he by the terms of § 3 of c. 843
irrevocably wedded in every case to the definition of 'fair net
operating income' therein contained." *Id.* at 704.

But, argues the owner, this will lead to inequities among
the tenants. If the board grants a decrease to one tenant, the
others will have to make up the difference so as to assure the
owner a "fair net operating income." In granting or denying
adjustments, however, the rent board must be mindful of the
provision of G. L. c. 140, § 32L (2), as appearing in St. 1973,
c. 1007, § 2, that "[a]ny rule or change in rent which does
not apply uniformly to all mobile home residents of a similar
class shall create a rebuttable presumption that such rule or
change in rent is unfair." This act, coupled with the availability
of judicial review and the clearly expressed objectives of the

act, provides sufficient protection to the owner and to the other tenants against the arbitrary granting of rent decreases. Another court, faced with the same issue, put it this way: "In exercising his discretion . . . the commissioner's power is necessarily circumscribed by this overriding objective. To be sure, this is a rather broad standard to guide the commissioner's discretion. However, in view of the strong presumption of constitutionality attaching to legislative enactments . . . and more importantly, the complexity of the matter of rent controls and regulation, we are persuaded that the standard is sufficient and that the act should be upheld." *241 E. 22nd St. Corp.* v. *City Rent Agency,* 33 N.Y. 2d 134, 142-143 (1973).

3. *Separation of powers.* The next argument advanced by the owner concerns whether § 7 of the act violates art. 30 of the Declaration of Rights of the Massachusetts Constitution,[8] and art. 89 of the Amendments to the Constitution by endowing the rent board with judicial authority. Section 7 states that the rent board "may regulate evictions of tenants at mobile home parks and may issue orders which shall be a defense to an action of summary process for possession." In the past, we have stated that "separation of powers does not require three 'watertight compartments' within the government." *Opinion of the Justices,* 372 Mass. 883, 892 (1977), quoting *Springer* v. *Government of the Phil. Islands,* 277 U.S. 189, 211 (1928) (Holmes, J., dissenting). Indeed, "an absolute division of the three general types of functions is neither possible nor always desirable." *Opinion of the Justices,* 365 Mass. 639, 641 (1974). "The critical inquiry is whether the actions of [one branch of government] interfere with the functions of another." *Boston Gas Co.* v. *Department of Pub. Utils.,* 387 Mass. 531, 541 (1982). "This latter [quality] is the essence of what cannot be tolerated under art. 30." *Opinion of the Justices,* 365 Mass. at 642.

---

[8] Article 30 provides: "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

Contrary to the owner's assertion, we can find nothing in § 7 which permits the rent board to interfere with the exercise of the judicial function. The language of the section closely tracks the provisions regulating evictions in other, older rent control acts. See, e.g., St. 1970, c. 843, § 6 (Brookline); St. 1976, c. 131, § 6 (Peabody [mobile home parks]). It has long been understood that successful implementation of a rent control program must include some local control over evictions, otherwise the objective of maintaining a stable rental market will be thwarted. *Block* v. *Hirsh,* 256 U.S. 135, 157-158 (1921). Empowering the board with the authority to "issue orders which shall be a defense to an action of summary process" is a traditional vehicle for forestalling evictions in response to newly imposed rent ceilings; rent control boards have then instituted certificate of eviction procedures or similar regulations as a way of channeling this authority. See, e.g., *Moulton* v. *Brookline Rent Control Bd.,* 385 Mass. 228 (1982); Rule 2 (d) (3) of the Uniform Rules of Summary Process (1982).

Such procedures do not contradict existing statutory provisions dealing with judicial resolution of disputes in the housing area. For example, in *Grace* v. *Brookline,* 379 Mass. 43, 53 (1979), we considered whether there was a conflict between the procedures pertaining to stays of eviction in the summary process act, G. L. c. 239, §§ 9-11, and Brookline's passage of a by-law imposing a six-to twelve-month waiting period before a purchaser of a condominium could evict the existing occupant.[9] We held that the operation of the by-law "merely

---

[9] The Brookline by-law was enacted pursuant to specific grant of authority to the town to establish rent control and, at the same time, to control evictions. St. 1970, c. 843. Chapter 843, § 6, explicitly gave the town the power to regulate evictions, and its language is almost identical to that of § 7 of the statute at issue here. The only difference of any consequence is that the Brookline statute specifies that the town "may by by-law regulate the evictions of tenants," while the Chelmsford statute simply states that "[t]he Board may regulate evictions of tenants at mobile home parks . . . ." We do not consider the additional phrase "by by-law" to be significant. As we noted in connection with the Cambridge rent control statute, St. 1976, c. 36, "[w]hen analyzing a grant of power to a municipal government we must keep in mind that 'a grant of an express power carries with it all unex-

postpones the application of c. 239, without compromising its objectives." *Id.* at 54. Similarly, the right of a landlord to judicial review of an adverse ruling by the rent board on an eviction application is preserved by the Chelmsford act: § 8 (2) explicitly provides for judicial review of the board's decisions in the District or Superior Courts. As we observed in *Grace, supra* at 54, regarding the relationship between the Brookline by-laws and c. 239, the eviction provisions "supplement c. 239; they do not supplant it." Section 7 of the Chelmsford act does not violate the separation of powers provision contained in art. 30.

4. *Unintelligibility.* The owner further contends that § 6 (1) of the act should be struck down because it is "unintelligible."[10] In effect, the owner argues that, since the word "tenants" makes no sense as written, it is impossible to attach any meaning to the entire section and therefore it is void.

We disagree. "[A] statute must be interpreted according to the intent of the Legislature . . . considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Commonwealth* v. *Graham,* 388 Mass. 115, 119 (1983), quoting from *Industrial Fin. Corp.* v. *State Tax Comm'n,* 367 Mass. 360, 364 (1975). "A statute should not read in a manner that defeats its intended utility." *Simon* v. *Solomon,* 385 Mass. 91, 100 (1982). Instead, when "[t]he draftmanship is faulty, . . . the duty devolves upon us to give . . . [the statute] a reasonable construction." *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.,* 371 Mass. 186, 190 (1976), quoting *Massachusetts Turnpike Auth.* v. *Commonwealth,* 347 Mass. 524, 528 (1964).

---

pressed, incidental powers necessary to carry it into effect.'" *Flynn* v. *Cambridge,* 383 Mass. 152, 158 (1981), quoting 3 C. Sands, Sutherland Statutory Construction § 64.02 (4th ed. 1974).

[10] Section 6 (1) states: "The Board may make individual or general adjustments, either upward or downward, as may be necessary to assure that *tenants* for mobile home park accommodations are established on levels which yield to owners a fair net operating income for such units" (emphasis added).

The conclusion is inescapable that the word "rents" was inadvertently omitted from § 6 (1).[11] Examination of a number of other rent control statutes reveals that each of them employs the term "rents" in the context of other language practically identical to that of the Chelmsford act. See, e.g., St. 1970, c. 842, § 7; St. 1970, c. 843, § 3; St. 1976, c. 131, § 3. Further, when the word "rents" is added to § 6 (1), this section becomes consistent with the rest of the Chelmsford law.

It is a "fundamental principle of statutory construction that in interpreting any particular provision it should be construed as part of the statute as a consistent whole." *Walker* v. *Board of Appeals of Harwich,* 388 Mass. 42, 51 (1983); C. Sands, Sutherland Statutory Construction § 46.05 (4th ed. 1973). It is true that we are not faced with the typical case of ambiguity in, or inconsistency between, sections of an act. The choice open to us here is between adopting the literal meaning of the words used, which renders the section unintelligible, and substituting or adding a word which was clearly intended and which gives the section the meaning plainly intended. Although this court has never before done so, "a large majority of the cases permit the substitution of one word for another where it is necessary to carry out the legislative intent or express clearly manifested meaning." C. Sands, Sutherland Statutory Construction, *supra* at § 47.36. We might resist substitution if we were not faced with such a clear case of mistake and if other legislative enactments on the same subject did not make the intended phrase so manifestly apparent. Rather than strike down this section of the act on account of a clear error, we hold that § 6 (1), reasonably read, should include the words "rents" either in place of or immediately following the word "tenants."

5. *Ex post facto law.* The plaintiff makes a final argument that § 10 of the act[12] is unconstitutional since it amounts to an

---

[11] If the word "rents" is added (and the word "tenants" is deleted or, alternatively, with the addition of an apostrophe, making it "tenants' rents") to the section, it makes sense.

[12] Section 10 provides: "Violations of this by-law or any order of the board shall be punishable by a fine of not more than one thousand dollars for any one offense."

ex post facto law,[13] an argument which we shall dispose of summarily. The application of rent controls to existing leases is constitutional, as is the imposition of rent ceilings based on a six-month "rollback" provision.[14] *Huard* v. *Forest St. Hous.,* 366 Mass. 203, 207-208 (1974). *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 700-701 (1971). Further, § 9 (1) operates in conjunction with § 10 only to punish landlords charging *future* rents in excess of the statutory ceiling; the act imposes no retroactive penalties for rents charged in the past. Therefore, it is not an ex post facto law.

The order granting the injunction is vacated and the case is remanded to the single justice for the entry of judgment.

*So ordered.*

---

[13] Article 24 of the Declaration of Rights of the Massachusetts Constitution states the prohibition against ex post facto laws: "Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government."

[14] Section 9 (1) of the Chelmsford act provides that "[t]he maximum rent of a mobile home lot or unit shall be the rent charged with the occupant for the month six months prior to the acceptance of this by-law by town meeting."