COMMONWEALTH *vs.* KARL D. CLEMMEY
(and a companion case[1]).

Bristol. February 8, 2006. - June 30, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Wetlands Protection Act. Grand Jury. Practice, Criminal,* Grand jury proceedings. *Constitutional Law,* Delegation of powers, Separation of powers.

The judge in a criminal action erred in dismissing the indictments against the defendants on the ground that the prosecutor failed to reveal exculpatory evidence, where the defendants did not demonstrate that the integrity of the grand jury process was impaired. [130-134]

This court concluded that the Legislature's delegation to the Department of Environmental Protection (department) of the power and responsibility for defining material terms of a certain exemption to the Wetlands Protection Act, G. L. c. 131, § 40 (Act), did not violate the constitutional doctrine of separation of powers, where the Legislature did not delegate the making of a fundamental policy decision, where the Act provided adequate direction to guide the department in defining the terms of the exemption, where the legislation making the delegation contained sufficient safeguards to control abuses of discretion, and where the delegation did not make the statute vague in a constitutional sense. [134-140]

INDICTMENTS found and returned in the Superior Court Department on December 19, 2003.

A motion to dismiss was heard by *Richard F. Connon,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel I. Smulow,* Assistant Attorney General (*Paul Molloy,* Assistant Attorney General, with him) for the Commonwealth.

*Howard M. Cooper* for Karl D. Clemmey & another.

CORDY, J. On December 19, 2003, a grand jury, sitting in Bristol County, returned a ten-count indictment against the Quirk Trust LLC (trust) and a virtually identical ten-count indictment against its manager, Karl D. Clemmey (Clemmey).

[1]Commonwealth *vs.* Quirk Trust LLC.

The indictments charged the defendants with violations of the Wetlands Protection Act, G. L. c. 131, § 40 (Act), in connection with tree clearing and landfilling activities undertaken by Clemmey on portions of the property owned by the trust.

The defendants moved to dismiss the indictments in the Superior Court on two separate grounds: first, that the Commonwealth had impaired the integrity of the grand jury proceedings; and second, that the Legislature had unconstitutionally delegated to the executive branch the responsibility for defining (by regulation) the criminal offenses punishable under the Act.

With respect to the first ground, the defendants argued that the proceedings were impaired because the Commonwealth had failed to inform the jurors that (1) the Act contained an exemption from its provisions for the "normal maintenance or improvement of land in agricultural use"; (2) Clemmey had expressed his belief that the trust property qualified for this exemption, and had acted accordingly; (3) Clemmey had received a certificate from the town of Mansfield to operate a horse farm on the property; and (4) Clemmey had entered into a United States Department of Agriculture (USDA) land user-district cooperative agreement identifying the property as a farm. They also argued that the Commonwealth had exacerbated its failure by (1) introducing evidence that Clemmey was well versed in the governing statutes and regulations, leaving the impression that the land clearly fell within the scope of the Act, that Clemmey knew this to be the case, and that he nevertheless intentionally violated the Act's provisions; and (2) improperly eliciting evidence of prior or irrelevant bad acts committed by Clemmey and others associated with the trust.

As to the second ground, the defendants argued that the separation of powers clause contained in art. 30 of the Massachusetts Declaration of Rights barred the Legislature from delegating to the Department of Environmental Protection (department) the authority to define the terms of the exemption ("normal maintenance or improvement of land in agricultural use") by regulation, and that the resulting regulations should be struck as unconstitutional. Once struck, the defendants contended, the statutory language, "normal maintenance or improvement of land in agricultural use," was unconstitutionally vague as applied to them.

After a nonevidentiary hearing, a judge in the Superior Court dismissed the indictments without prejudice, on the ground that the Commonwealth's failure to inform the grand jury that the Act "contains an agricultural exemption, which specifically exempts from both its civil and criminal prohibitions any and all 'work performed for normal maintenance or improvement of land in agricultural use,' " and that Clemmey believed "this exemption applied to his conduct," "undermine[d] the credibility of the evidence and is likely to have affected their decision to indict." Noting that "[t]he prosecutor should have presented this information to the grand jury to allow them to consider the possibility of [Clemmey's] lack of intent to violate the Act as well as the defense of the agricultural exemption," the judge concluded that the appropriate remedy was dismissal. In light of his ruling, the judge did not reach the defendants' unlawful delegation claim.

The Commonwealth appealed, and we transferred the cases to this court on our own motion. We conclude that the prosecutor's failure to inform the grand jury of the Act's agricultural exemption and Clemmey's claimed reliance on it did not impair the grand jury proceedings. Similarly, the elicitation of evidence regarding prior or irrelevant bad acts did not have a significant effect on the grand jury's decision to indict. We further conclude that the Legislature's delegation of authority to the department to promulgate definitional regulations regarding the statutory exemption was sufficiently limited and directed to withstand a constitutional challenge.

1. *The governing Act and regulations.* General Laws c. 131, § 40, provides for the protection of flood plains, seacoasts, and other wetlands. It states that "[n]o person shall remove, fill, dredge or alter any bank, riverfront area, freshwater wetland, coastal wetland . . . or swamp bordering on the ocean or on any estuary, creek, river, stream, pond, or lake, or any land under said waters . . . without filing written notice of his intention to so remove, fill, dredge or alter . . . and without receiving and complying with an order of conditions . . . ." *Id.* The notice of intention is filed with the local conservation commission, which can either grant or deny the request, or condition the work on certain stipulations for the protection of, inter alia,

wetlands. The Act punishes those who violate its provisions with either criminal penalties — "a fine of not more than twenty-five thousand dollars or by imprisonment for not more than two years, or both such fine and imprisonment" — or "a civil penalty not to exceed twenty-five thousand dollars for each violation."[2] *Id.*

The provisions of the Act do not apply to "work performed for normal maintenance or improvement of land in agricultural use." *Id.* As originally enacted, "[l]and used for agricultural purposes shall be exempt from the provisions of this section." St. 1967, c. 802, § 1. The language has been amended several times. In 1972, the exemption applied to "work performed for agricultural purposes," St. 1972, c. 784, § 1; in 1974, it was rewritten to read, "to work performed for normal maintenance or improvement of lands for agricultural use," St. 1974, c. 818, § 1; in 1975, "in" replaced "for" preceding the phrase "agricultural use." St. 1975, c. 363, § 2. In 1991, the Legislature further amended the Act by adding the following paragraph: "Within [120] days . . . the department, upon the advice and consent of the Commissioner of the Department of Food and Agriculture, shall promulgate rules and regulations . . . which shall establish definitions for the term 'normal maintenance or improvement of land in agricultural, or in aquacultural use', for each agricultural commodity, or where appropriate because of similarities in cultural practices, groups or commodities in the Commonwealth." St. 1991, c. 141, § 2. The amendment also provided that the department "shall create a farmland advisory board to be appointed by the commissioner consisting of five persons one a member of the cooperative extension service, one a member of the USDA soil conservation service, one a member of a municipal conservation commission who has demonstrated expertise in agricultural issues, and two commercial farmers with expertise in different agricultural commodities to assist the department in the drafting of rules and regulations pursuant to this paragraph." *Id.* Finally, the

---

[2]The defendants were each charged, in several counts, with both altering various wetlands by the "clear cutting of vegetation," and filling the same wetlands, all without complying with the notice and approval provisions of G. L. c. 131, § 40 (Act).

Legislature required the department to submit its promulgated regulations to the committee on natural resources and agriculture for its review prior to their effective date. St. 1991, c. 141, § 4.

In enacting the 1991 amendment, the Legislature explained the original purpose of the exemption, the interpretive and enforcement issues that had frustrated that purpose and made amendment necessary, and how the amendment was intended to further that purpose. The exemption was necessary to balance the need to protect wetlands and other fragile habitats with the "future economic viability of . . . farms [in the Commonwealth]." St. 1991, c. 141, § 1. Those farmers, however, "are faced with a growing morass of regulation and restriction which is increasing the cost of farming." *Id.* Although the Act had exempted " 'work performed for normal maintenance or improvement of land in agricultural use[,'] many routine and long standing farm operations [were] being challenged by local and state agencies, creating confusion, frustration and . . . costly delays." *Id.* In order to correct this problem, the Legislature directed that "a uniform definition" be established "to assist the agricultural community in complying with the [Act] and reducing the current uncertainty that exists." *Id.*

Pursuant to the Legislature's statutory command, the department promulgated regulations defining the terms "[l]and in agricultural use," "[n]ormal maintenance of land in agricultural use," and "[n]ormal improvement of land in agricultural use." 310 Code Mass. Regs. § 10.04 (1997). Those regulations provide that "[l]and in agricultural use means land within resource areas [wetlands] or the Buffer Zone *presently* and primarily used in producing or raising one or more of the following agricultural commodities for commercial purposes: 1. animals, including but not limited to livestock, poultry, and bees . . ." (emphasis added). *Id.* They also provide that "land in agricultural use" means "land . . . *presently* and primarily used in a manner related to, and customarily and necessarily used in, producing or raising such commodities, including but not limited to: existing access roads and livestock crossings; . . . canals/channels; . . . and land under farm structures" (emphasis added). *Id.* Of particular significance to the present case, "[l]and in agricultural use may

lie inactive for up to five consecutive years." *Id.*[3] The regulatory definitions of "[n]ormal maintenance" and "[n]ormal improvement" of land in agricultural use describe in detail the type of work considered "normal" and explain on what land and structures such work is acceptable under the exemption.

2. *Background.* The record before the Superior Court judge, which included a transcript of the grand jury proceedings, reflect the following. The trust is an organization with which several members of the Clemmey family are affiliated. In or about September, 2000, the trust purchased property located at 175 Essex Street in Mansfield from other, more distant members of the family. The property encompasses a significant amount of wetlands, fields, a farmhouse, a barn, and various other outbuildings common to farms. The property was once used for farming but the land had not actually been used for that purpose for at least ten years prior to its purchase by the trust.[4] After its purchase, the property was, at least informally, named "Clemmey Farm," and in November, 2001, Clemmey, who is a member of the Massachusetts Farm Bureau Federation, Inc., and owns a number of horses in various locations in Mansfield, successfully applied for a Mansfield business certificate to operate a horse farm on the property.[5]

In October, 2001, Clemmey invited Richard Lewis, the administrator of the Mansfield conservation commission (commission), to tour the property, and explained to Lewis his long-

---

[3]The regulation also provides that land may lie inactive for a term longer than five years if it is under a United States Department of Agriculture (USDA) contract. 310 Code Mass. Regs. § 10.04 (Agriculture) (a) (1997). There is no claim that the trust land had lain inactive under the terms of such a contract.

[4]Before the grand jury, testimony was elicited from the administrator of the Mansfield conservation commission, Richard Lewis, that his discussion with others in the town led him to understand that no farming had actually occurred on the property for "probably ten or fifteen years." With its opposition to Clemmey's motion to dismiss, the Commonwealth submitted a number of affidavits from neighbors of long standing as well as affidavits from town officials regarding the tax classification of the property, to the same effect. In response, the defendants note that "there is no evidence that [the land] has ever been used for anything other than farming." This, of course, is not inconsistent with the land being inactive.

[5]In November, 2001, Clemmey entered into a USDA land user-district cooperative agreement, in which he identified his property as farm land.

term plan to turn the property into a horse farm. During that same month, Clemmey hired a land clearing company to cut and clear trees, plants, and shrubs on the property. In January, 2002, he also hired a landfilling company to fill much of the land, including wetlands, as soon as the clearing was completed. Although the land clearing company had done some preliminary work in October, 2001, a substantial portion of the tree cutting and clearing, and the subsequent landfilling, was performed in late February and mid March, 2002. In all, approximately 5.8 acres of wetlands were clear cut and filled.

In February, 2002, the town and the commission began receiving complaints regarding the heavy construction activity taking place on Clemmey Farm. In turn, Lewis contacted Edward Burke, a member of a department team that investigates complaints of illegal wetlands filling. On March 12, 2002, Burke and Lewis met with Clemmey, Clemmey's wife (Carole), Clemmey's son (Dan), and a representative from the Massachusetts Farm Bureau (Jay Slattery) at the property. According to Lewis's grand jury testimony, the meeting began in the farmhouse, where Clemmey told them that "what he wanted to do with his property was to establish a horse farm." Lewis also testified that he "did not see any evidence of farming activities during the March 12 visit" and that during his prior October, 2001, visit, "there [were] no feed bags present" and "no animals present. There [were] no . . . signs of any farming activity."

The group then began a walking tour of the property. Lewis testified that this tour revealed significant clearcutting and landfilling of wetlands and wetland buffer zones that had occurred since his October, 2001, visit to the property.[6] As a result, he told Burke, Clemmey, and Dan Clemmey that there had been direct filling of a wetland resource area and that this was a significant problem. In response, Dan Clemmey stated that the Clemmeys "could have filled the whole fucking thing and dealt with it later" and that if Lewis "turn[s] this into a problem, there's going to be other things raised and it's going to be a problem" for Lewis. As to the former statement, Lewis noted

[6]In addition, Clemmey had altered a stream bank and the land underneath a stream, and had elongated an existing culvert in the wetland area, to allow for the passage of trucks and heavy machinery.

that "[h]aving had a vast amount of experiences with [Dan] Clemmey before, that statement did not shock me." As to the latter statement, Lewis explained that he took it "to be something of a threat" and "did not allow myself to be alone with either . . . Clemmey or Dan Clemmey" thereafter.[7] Lewis further testified that, once back at the farmhouse, Burke told Clemmey that "unpermitted wetland activity . . . had occurred on the property," that no more activity should take place, and that Clemmey should hire a wetlands consultant to determine how much damage had been done on the property.[8] When the prosecutor asked what Clemmey's response to this was, Lewis explained that he did not "remember [Clemmey's] exact statement," but that the members of the Clemmey family "acknowledged that filling had taken place" and that Clemmey agreed to hire a consultant.

Subsequently, Clemmey hired wetland consultant Michael Marcus. According to an interview of Marcus conducted by an environmental police officer prior to the presentment of the case to the grand jury, Clemmey told Marcus that "he was going to create a horse farm and thought he had the right to clear and grade [fill] the property because of an agricultural exemption [to the Act]." This information was never presented by the prosecutor to the grand jury. However, the grand jury did hear testimony (from Burke) that Marcus toured the property with Burke, Lewis, and Dan Clemmey on March 27, 2002, and that during this visit, Marcus told Burke that the property was "a horror show concerning the wetlands," that a major violation had occurred, and that it would "take awhile" to determine how much damage had been done to the wetlands in light of the extensive alterations. They also heard testimony from Marcus that after five or six additional visits to the site to conduct testing and analysis, he determined that 5.8 acres of wetlands were filled, and submitted a wetlands restoration plan to Clemmey in July, 2002. The plan was "probably a hundred-and-fifty to two-hundred-thousand dollar . . . project," and Clemmey "thought

---

[7]Lewis explained his concern to the grand jury by stating that "these [Clemmeys] are big guys."

[8]Burke also issued a unilateral administrative order, which requires violators to cease and desist from all unpermitted activities concerning wetlands.

it was excessive" and "asked [Marcus] not to submit the . . . plan" to the department. The plan was not submitted, and this interaction ended Marcus's work for Clemmey.[9]

Of particular relevance to the defendants' claim that improper evidence of bad acts was presented, the grand jury also heard the following testimony. Marcus testified that "part of [his] work is [to] work with a lot of people who violate wetlands, either unintentionally or intentionally, and it's the policy of our company that whenever we work with somebody who's violated wetland laws, they pay us in full before we begin work and that's what we did with" Clemmey. Lewis testified that Clemmey had sought permits to perform work in wetlands or wetland buffer zones on four previous occasions, had once appealed a permit issued to an abutting landowner, and thus was "extremely familiar" with and "has full knowledge of the Wetlands Act and regulations." He also testified that there were two other incidents in which Clemmey appeared to have violated the Act. In one (occurring after the cutting and filling at issue here), Lewis claimed that Clemmey, without a permit, "filled in probably about two-thirds of [an] isolated wetland area" on another property. He added that "after [they] issued the cease and desist, he continued to do some additional work on the site." In the other incident, Lewis explained that Clemmey, in working on a parking lot, violated the conditions of the permit he received from the commission, and had to "get a few things in conformance with the permit," but that he "eventually got all those things squared away and completed the project." Lewis also made several oblique references to the "history" between Clemmey and the town, leaving the impression that Clemmey had used and abused the permitting process a number of times before.

Finally, the grand jury heard Marcus, Burke, and Lewis each testify that, based on their experience and observations, wetlands had been altered and filled on the trust property in violation of the Act.

---

[9]The prosecutor did not ask Marcus what Clemmey had told him regarding the exemption and the reasons he had proceeded to clear cut and fill wetlands without serving a notice of his intentions and receiving the approvals that would be required if the exemption did not apply.

3. *The integrity of the grand jury process.* The judge dismissed the indictments because the grand jury were not informed that the Act included an exemption for "land in agricultural use" and that Clemmey believed this exemption applied to his clearcutting and landfilling activities. The Commonwealth now asserts that the dismissal constituted reversible error because the prosecutor had no duty to introduce such evidence.

"Although generally the adequacy or competency of evidence before a grand jury is not a matter for judicial inquiry . . . we will consider whether grand jury evidence was sufficient to warrant a finding of probable cause . . . and whether the defendant has shown that the integrity of the grand jury proceedings was impaired." *Commonwealth* v. *Mayfield*, 398 Mass. 615, 619-620 (1986), and cases cited. "In certain instances, the failure to disclose known information may impair the grand jury proceedings." *Id.* at 620.

While "[p]rosecutors are not required in every instance to reveal all exculpatory evidence to a grand jury," *Commonwealth* v. *LaVelle*, 414 Mass. 146, 150 (1993), quoting *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985), they must present exculpatory evidence "that would greatly undermine either the credibility of an important witness or evidence likely to affect the grand jury's decision," as well as evidence the withholding of which would cause the presentation to be seriously tainted. *Commonwealth* v. *Wilcox*, 437 Mass. 33, 37 (2002). See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984). See also *Commonwealth* v. *Arroyo*, 442 Mass. 135, 143 (2004) ("we require that prosecutors not 'distort the meaning' of the evidence that they present by withholding certain portions of it"). If the defendant can show that the prosecutor omitted such exculpatory evidence and that the evidence withheld would likely have affected the grand jury's decision to indict, dismissal is warranted. Because there is no "satisfactory, comprehensive statement of what conduct does, and what conduct does not, impair the integrity of the grand jury process," *Commonwealth* v. *Mayfield, supra* at 620, we must deal with the conduct in question "case by case." *Id.*

In the instant case, Clemmey has not demonstrated that the

integrity of the grand jury process was impaired. On the one hand, it is fair to assume that had the grand jury been made aware of the Act's exemption, and Clemmey's claim (made after the fact to his environmental consultant) that he thought he could clear and fill the trust's wetlands under that exemption, they may have viewed some of the evidence before them in a different light.[10] On the other hand, the presentation of evidence regarding the exemption would merely have shifted some of the focus of the inquiry to whether the exemption applied. In those circumstances, the prosecutor would have appropriately relied on the regulatory definitions applicable to the exemption, and the straightforward evidence in his possession that the land had not been used for agricultural purposes for more than ten years, making the exemption inapplicable. We have not required a prosecutor to present evidence to a grand jury that a person under investigation claimed a license or exemption, where subsequent investigation demonstrated the claim was invalid. Whether the question of the exemption's inapplicability (or invalidity) may appropriately reemerge at trial has little bearing on the prosecutor's obligation to present to the grand jury certain forms of exculpatory evidence (in his possession), the withholding of which would seriously taint or distort the proceedings. While the presentation of the evidence in question here may have altered the discussion and possibly the outcome of the grand jury proceeding, that is an insufficient basis on which to set aside an indictment. In the circumstances of this case, where the evidence in the prosecutor's possession was that the defendants' actions did not qualify for the exemption, we cannot say that the withheld evidence would have greatly undermined the credibility of the Commonwealth's case, and likely affected the grand jury's decision to indict.[11,12] See *Com-*

---

[10] For example, testimony regarding Clemmey's apparent acknowledgment that he had cleared and filled wetlands (without notice of approvals) might not have been considered solely as an admission that he had violated the Act. Additionally, testimony that Clemmey was well versed in the provisions of the Act might have suggested not only his familiarity with what it prohibited, but also familiarity with the very exemption that might apply to his circumstances.

[11] This is not a case where the prosecutor withheld substantial evidence of a valid permit or license, the existence of which would have excused Clemmey from any criminal liability.

[12] In his decision dismissing the indictments, the motion judge referenced

*monwealth* v. *Garrity*, 43 Mass. App. Ct. 349, 353 (1997), quoting *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 754 (1995) ("Although the grand jury were not aware of the existence of the indemnity agreement on which the defendant purportedly relied in making the withdrawals [for which the Commonwealth was seeking to indict him], we conclude that the additional 'information would not have greatly undermined the credibility of evidence against the defendant, and would not have affected significantly the grand jury's decision to indict.' . . . [T]he agreement did not authorize the defendant to reimburse himself from the estate for the expenses he incurred on the . . . property"); *Commonwealth* v. *Bachman*, 41 Mass. App. Ct. 757, 760-761 (1996) (where counsel did not assert exemption to statute criminalizing gun carrying, no new trial because "had [the exemption] been asserted, [it] would have availed the defendant nothing because the defendant would not have been able to establish his entitlement to the exemption"). The indictments should not, therefore, have been dismissed.[13] See *Commonwealth* v. *Biasiucci*, 60 Mass. App. Ct. 734, 738 (2004) ("Our decision to uphold the indictment can rest on the simple ground that such exculpatory evidence as may be conceived to have existed was not weighty enough to constitute a substantial challenge to the demonstration of probable cause, and, if laid before the grand jury, would almost certainly have left unaltered the disposition to indict").

the bearing that the withheld evidence might have had on the issue of Clemmey's intent. While the question is not directly before us, we do not see Clemmey's intent to violate the statute as being an element of the crimes with which he has been charged. Although the Commonwealth may seek to show that the defendant acted in a calculated manner, intentionally violating statutory provisions he knew were applicable, the only intent required is an intention to commit the acts of filling and altering the wetlands. See *Commonwealth* v. *Belanger*, 30 Mass. App. Ct. 31, 33 (1991) (violations of statutes that impose punishment out of public policy concerns "have been described as 'public welfare' or 'strict liability' offenses," and "lack of knowledge of the law or of the fact that the law has been violated does not exonerate the person who may have unwittingly violated the statute").

[13]We do not base our ruling on whether the existence and applicability of the exemption is an "affirmative defense." See *Commonwealth* v. *Landry*, 438 Mass. 206, 211 (2002). The question is whether the prosecutor possessed exculpatory evidence, the withholding of which likely affected the grand jury's decision to indict.

We also reject the contention that testimony concerning prior "bad acts" committed by Clemmey and his son (and testimony of a threatening statement made by Clemmey's son to Lewis) requires dismissal of the indictments. Although some of the testimony was probative of little more than a propensity to violate the Commonwealth's environmental laws (an improper objective), "the defendant has not proved that the . . . statements, viewed in the context of all the evidence presented to the grand jury, 'probably made a difference' in their decision to indict." *Commonwealth* v. *Freeman*, 407 Mass. 279, 283 (1990), citing *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621-622 (1986).

Clemmey takes specific exception to Lewis's testimony that Clemmey "violated" the order of conditions in another project in which a permit for filling a piece of property to create a parking lot was approved, but soon thereafter Lewis "had to go down to the site, [and] issue[] a stop work order"; that Clemmey recently "went in and cut down every tree on [a 7,800 square foot] property [and] filled in probably about two-thirds" of this isolated wetlands area despite being denied a permit to do so; that Clemmey's son (in the presence of Clemmey) threatened Lewis; and that Clemmey had a long history of wetlands violations.

Assuming that the presentation of some (or even most) of this evidence to the grand jury was either improper or irrelevant, the "presence of adequate direct evidence of the defendant's commission of the crimes renders insignificant any arguably improper information contained in the . . . testimony." *Commonwealth* v. *Freeman, supra* at 283. Multiple witnesses (experts in the field) testified before the grand jury that Clemmey had engaged in cutting and filling activities on land protected by the Act. In the face of such evidence, evidence of other improper acts (even similar in nature) cannot be considered to have affected the grand jury's ultimate conclusion. There is little chance that the grand jury could have been led to indict Clemmey on the basis of an apparent propensity to commit such crimes, rather than on the direct and overwhelming evidence that he had done so on the Clemmey farm. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 175, cert. denied, 525 U.S.

1007 (1998), quoting *Commonwealth* v. *Freeman, supra* at 284 (" 'Cases in which we have dismissed indictments usually have involved improper statements made by the *sole* witness to appear before the grand jury.' . . . In this case, there were multiple witnesses before the grand jury and the cumulative evidence against [the accused] was powerful"); *Commonwealth* v. *Ianello*, 401 Mass. 197, 198, 199 (1987) (prosecutor's statements to grand jury that accused was "five feet tall but . . . all muscle" and that accused was "hot tempered and knows Karate so be careful and don't get him too mad" were improper but did not impair integrity of grand jury); *Commonwealth* v. *Champagne*, 399 Mass. 80, 84 (1987) (defendant "has not shown that presentation of information that he and others had been suspected of previous attacks on inmates was likely to have made a difference in the grand jury's determination to indict").

4. *Nondelegation doctrine.* Despite our conclusion that the judge erred in dismissing the indictments based on a perceived impairment of the integrity of the grand jury process, we may affirm his decision on any ground supported by the record. To this end, Clemmey argues, as he did below, that the Legislature's delegation to the department of the power and responsibility for defining material terms of the agricultural exemption violated the separation of powers doctrine.

Article 30 provides that "[i]n the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end that it may be a government of laws and not of men." This doctrine "encompasses the general principle that the Legislature cannot delegate the power to make laws." *Construction Indus. of Mass.* v. *Commissioner of Labor & Indus.*, 406 Mass. 162, 171 (1989). However, "separation of powers does not require three 'watertight compartments' within the government." *Opinion of the Justices*, 372 Mass. 883, 892 (1977). In fact, "an absolute division of the three general types of functions is neither possible nor always desirable." *Opinion of the Justices*, 365 Mass. 639, 641 (1974). The question whether a specific delegation of

power violates the Constitution is a "question of degree." *Construction Indus. of Mass.* v. *Commissioner of Labor & Indus., supra* at 171.

While "[n]o formula exists for determining whether a delegation of legislative authority is 'proper' or not," *Chelmsford Trailer Park* v. *Chelmsford*, 393 Mass. 186, 190 (1984) (*Chelmsford*), we have previously set forth three factors that bear on our determination: "(1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?" *Id.*

At the outset, Clemmey contends that we should not apply these factors here, where the Legislature has delegated responsibility to define an exemption to a criminal statute. Specifically, he argues that the Legislature may never delegate the definition of criminal conduct. However, as early as 1914, we upheld a significant delegation by the Legislature to the police commissioner of Boston to define broadly the scope of an exception to what we described as "a penal statute." See *Commonwealth* v. *Fox*, 218 Mass. 498, 499-500 & n.* (1914) (commissioner may designate times and places in Boston "wherein, and not elsewhere in the city, it shall be lawful . . . under such general rules as he shall make . . . for any hawker . . . to stop . . . for the purpose of selling merchandise"). See also *Commonwealth* v. *Diaz*, 326 Mass. 525, 527 (1950) (upholding delegation from Legislature to agency even though general rule that Legislature cannot delegate legislative authority "is especially true with respect to [the] power to define crimes and establish penalties therefor"). Accord *Avatar Dev. Corp.* v. *State*, 723 So. 2d 199, 205 (Fla. 1998), quoting *Rosslow* v. *State*, 401 So. 2d 1107 (Fla. 1981) (explaining no delegation violation where statute "granted the Department of Citrus the authority to establish by administrative rule exemptions from a law making it a crime to sell and transport citrus fruit without a certificate of inspection"). Notably, the Legislature

did not delegate to the department either the authority to establish new crimes and penalties regarding wetlands, or to exempt categories of activity from the coverage of the Act. The crimes of altering or filling of wetlands, and the exemption for "work performed for normal maintenance or improvement of land in agricultural use" were set forth directly in the statutory language.

Nonetheless, unlike other penal statutes we have upheld against delegation challenges, the Act here provides for substantial penalties, including the deprivation of liberty. Such penalties implicate fundamental due process principles, such as the rule of lenity and the void-for-vagueness doctrine. See *Commonwealth* v. *Clint C.*, 430 Mass. 219, 227 (1999), quoting *Commonwealth* v. *Spano*, 414 Mass. 178, 180 (1993) ("Due process requires not only fair notice of proscribed conduct, but also that penal statutes be administered in a manner that prevents arbitrary and discriminatory enforcement"); *Commonwealth* v. *Maxim*, 429 Mass. 287, 292 (1999), quoting *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543, 547 (1994) ("It is a central tenet of our constitutional law that, as a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden should be deemed void for vagueness"). As such, our analysis of the delegation should include not only consideration of the factors set forth in *Chelmsford*, but also an examination whether fair notice of the conduct proscribed has been provided.

We are persuaded that the delegation provided for in the Act does not violate art. 30. First, the Legislature did not delegate the making of a fundamental policy decision. The Legislature was quite clear as to the policy decision it had made and wanted implemented. That policy was that the interests of environmental protection and agriculture were to be balanced in a way that protected "routine and long standing farm operations." St. 1991, c. 141, § 1. The delegation of the definitions of "land in agricultural use" and "normal maintenance or improvement" of such land simply directed the department to work out the details necessary to the implementation of the policy. See *Commonwealth* v. *Diaz*, *supra* at 527, quoting *Field* v *Clark*, 143 U.S. 649, 694 (1892) ("one of the exceptions to or qualifica-

tions of [our nondelegation doctrine] is that the Legislature may delegate to a board or an individual officer the working out of the details of a policy adopted by the Legislature. . . . 'To deny this [power] would be to stop the wheels of government' ").[14] The delegation, which provided that the terms were to be defined with the assistance of an advisory board of persons expert in the particulars and customs of farming operations, and were to be reviewed and approved by the Commissioner of Food and Agriculture (commissioner), was a proper way of accomplishing the balancing of interests sought by the Legislature because it ensured that the scope of the agricultural exemption would be based on the application of real-world farming practices. See *Opinions of the Justices*, 427 Mass. 1211, 1217 (1998) ("Authorizing the city to define the terms 'domestic partner' and 'dependents' is not a fundamental policy decision; rather, the authorization allows the city to implement the Legislature's previously stated purpose of extending health care coverage to employees, their household members, and their dependents").

Second, the Act provides adequate direction to guide the department in defining the terms of the exemption. The statutory exemption applies to "land *in* agricultural use" (emphasis added). The 1975 amendment, which changed the word "for" to "in," strongly suggests the Legislature's intent that the exemption apply to land currently being used for agriculture. The 1991 amendment reinforces this intention. The language used in its enactment specifically identifies the Legislature's concern for the "700,000 acres of land in Massachusetts which is owned and managed by farmers" and the jeopardy to "the future economic viability of our farms," and the preservation of "routine and long standing farm operations." St. 1991, c. 141, § 1. These phrases are consistent with an intention that the exemption apply to currently functioning farms, and provide adequate direction to the department in exercising its responsibility to enact detailed and certain regulations regarding what

---

[14]In *Commonwealth* v. *Diaz*, 326 Mass. 525, 527 (1950), quoting *Field* v *Clark*, 143 U.S. 649, 694 (1892), we went on to state that "[t]here are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside the halls of legislation."

land was to be considered "in agricultural use." With respect to the terms "normal maintenance and improvement" of land in agricultural use, the 1991 enactment language again adequately informs the department that it should balance the needs of farmers against the need to protect wetlands by not overly regulating their traditional activities. The statutory creation of a farmland advisory committee to assist the department in defining these terms adds to this guidance. A commonsense reading of the statute — and one that the department seems to have followed — is that the department should determine what activities farmers traditionally and normally engage in to maintain and improve their agricultural land and include such activities within the scope of the exemption. See *Opinions of the Justices, supra* at 1217 (terms to be defined by delegatee "have meanings evident from the words themselves, and thus impose constraints on the city's authority to extend benefits"). Cf. *Powers* v. *Secretary of Admin.*, 412 Mass. 119, 128 (1992) ("Legislature has set forth adequate direction for the receiver's implementation of the Receivership Act. The . . . Act authorizes the receiver to exercise various enumerated powers which, by their terms, provide clear direction as to the manner in which the receiver shall implement the Legislature's policy decision to improve Chelsea's financial position").

There are also sufficient safeguards in the legislation to control abuses of discretion. The farmland advisory committee, the need to obtain the approval of the commissioner, the requirement that the exemption definitions be uniform for all persons, the limited nature of the delegation, the requirement that the regulations be submitted to a legislative committee prior to implementation, and the availability of judicial review "sufficiently demarcate the boundaries of regulatory discretion so that the act provides" the necessary safeguards to control abuses of discretion. *Tri-Nel Mgt., Inc.* v. *Board of Health of Barnstable*, 433 Mass. 217, 226 (2001) ("Parties who believe that a board's regulation has exceeded proper boundaries may seek judicial review of the regulation, pursuant to an action for declaratory relief")[15]; *Opinions of the Justices, supra* at 1217-1218 (after analyzing first two *Chelmsford* factors, Justices

---

[15]As we explained in *Tri-Nel Mgt., Inc.* v. *Board of Health of Barnstable*,

concluded "there are adequate safeguards for any possibility of abuse of any claimed discretion," observing that there is a "mechanism that would allow any possible claims that the city has abused its discretion to be heard"). See Note, Reexamining the Massachusetts Nondelegation Doctrine: Is the "Areas of Critical Environmental Concern" Program an Unconstitutional Delegation of Legislative Authority?, 31 B.C. Envtl. Aff. L. Rev. 103, 129 (2004) ("the second and third [*Chelmsford*] inquiries seem to encapsulate the 'totality of the protection against arbitrariness' goal" of *Arlington* v. *Board of Conciliation & Arbitration*, 370 Mass. 769 [1976]). Cf. *Corning Glass Works* v. *Ann & Hope, Inc. of Danvers*, 363 Mass. 409, 422 (1973) ("Rate making . . . may be delegated to a public board or officer with very general guides, but only if provision is made for judicial review of claims of confiscation").

Finally, we conclude that the delegation here does not make the statute vague in the constitutional sense. The delegation and subsequent definitions improve the uniformity of, and reduce any prior uncertainty as to, the specific application of the statutory exemption. It requires no extended conversation to conclude that a person of ordinary intelligence would properly be on notice of what conduct falls within the statutory exemption as further detailed in the regulations, especially where the statute itself directs the reader to the applicable regulations. Moreover, the regulations provide that a person uncertain as to whether G. L. c. 131, § 40, applies to land or work that may affect an area subject to protection under the statute may submit a request for a determination of applicability to the local conservation commission. 310 Code Mass. Regs. § 10.05(3)(a)(1) (1997). The conservation commission is required to make a determina-

433 Mass. 217, 226 n.11 (2001), G. L. c. 231A, § 2, "provides that the declaratory judgment procedure 'may be used to secure determinations of right[s] . . . under . . . a charter, statute, municipal ordinance or by-law, or administrative regulation, including determination of any question of construction or validity thereof which may be involved in such determination.' "

Persons (with proper standing) may challenge a part of or the entire regulatory definition adopted by the department if they believe the definition violates the governing statute, the Constitution, or other applicable laws, or even if they are simply unsure whether the regulation, as written, is applicable to their circumstances.

tion within twenty-one days of its receipt of the request. 310 Code Mass. Regs. § 10.05(3)(b)(1) (1997).

5. *Conclusion.* Because the integrity of the grand jury process was not impaired, and the Act's delegation was not unconstitutional, we vacate the order dismissing the indictments against the defendants, and we remand the cases to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*