SUPREME JUDICIAL COURT 
 
 ATTORNEY GENERAL vs. TOWN OF MILTON & another;[1] EXECUTIVE OFFICE OF HOUSING AND LIVABLE COMMUNITIES, third-party defendant

 
 Docket:
 SJC-13580
 
 
 Dates:
 October 7, 2024 – January 8, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Massachusetts Bay Transportation Authority. Housing and Livable Communities. Housing. Attorney General. Constitutional Law, Separation of powers. State Administrative Procedure Act. Administrative Law, Administrative Procedure Act, Rulemaking, Regulations. Zoning, Multiple dwelling. Regulation. Declaratory Relief. Practice, Civil, Declaratory proceeding.
 
 

  
      Civil action commenced in the Supreme Judicial Court for the county of Suffolk on February 27, 2024.
      The case was reported by Georges, J.
      Eric A. Haskell, Assistant Attorney General (Erin E. Fowler & Jonathan Burke, Assistant Attorneys General, also present) for the plaintiff & another.
      Kevin P. Martin (Jaime A. Santos also present) for the defendants.
      The following submitted briefs for amici curiae:
      Thomas J. Dougherty for William J. Driscoll, Jr., & another.
      Amy E. Kwesell & Jonathan G. Murray for towns of Hamilton & Middleborough.
      Paul J. Hogan for Eastern Massachusetts Small Business Coalition.
      Nicole Horberg Decter, Ryan McGovern Quinn, & Nico Marulli for Massachusetts AFL-CIO.
      John Pagliaro & Daniel B. Winslow for New England Legal Foundation.
      Andrew L. Barrett for Denny Swenson & others.
      Douglas S. Brooks for Brian O'Halloran & others.
      Kathleen M. Heyer, Jesse D. Schomer, & Robert K. Hopkins for Real Estate Bar Association for Massachusetts, Inc.
      Gary M. Ronan for Francis X. Bellotti & others.
      Frank J. Bailey & John C. La Liberte for Pioneer Public Interest Law Center & another.
      Matthew J. Connolly & Valerie A. Moore for Massachusetts Housing and Shelter Alliance, Inc., & others.
      Jacob M. Love, Oren M. Sellstrom, Elizabeth Ritvo, & Meghan E. McCafferty for Central Massachusetts Housing Alliance, Inc., & others.
      Katie E. Hyma for Metropolitan Area Planning Council & others.
      Michael Walsh for John Kolackovsky.
      Gregory S. Sampson & Erika Dennery for NAIOP Massachusetts, Inc.
      Sammy Nabulsi & Justin Saif for Abundant Housing MA, Inc., & others.
      Benjamin Chapin & Andrew K. Waks, of the District of Columbia, & Felicia H. Ellsworth for Massachusetts Housing Partnership Fund Board.
      Karla L. Chaffee, Jack Tierney, & Jeffery W. Sacks for Citizens' Housing and Planning Association & others.
      Stephen M. Acerra, Jr., pro se.
      Diana C. Viens for Winthrop Says No to 3A Committee.
      Patricia Whiting, Andrea Moon Park, & Mark Martinez for Homes for All Massachusetts & another.
      Ellen Wright & Michael Walsh for Ellen Wright.
      BUDD, C.J.  Nearly four years ago, the Legislature passed G. L. c. 40A, § 3A, the Massachusetts Bay Transportation Authority (MBTA) Communities Act (§ 3A or act), which was designed to address the ongoing housing crisis in the Commonwealth by requiring cities and towns that benefit from having local access to MBTA services to adopt zoning laws that provide for at least one district of multifamily housing "as of right" near their local MBTA facilities.  In February of 2024, residents of the town of Milton (town), which has four MBTA stations along the Mattapan High Speed line, voted down a proposed zoning scheme to satisfy the requirements of the act.  The Attorney General then brought suit against the town to enforce the act.
      Here we are asked to determine whether the act and its corresponding guidelines are constitutional and valid, and whether the Attorney General has the authority to sue in equity to enforce § 3A.  We conclude that the act is constitutional and that the Attorney General has the power to enforce it.  However, because the Executive Office of Housing and Livable Communities (HLC) did not comply with the Administrative Procedure Act (APA), G. L. c. 30A, when promulgating the guidelines, they are ineffective.  For this reason, we grant declaratory relief in part and dismiss the remaining claims.[2]
      Background.  1.  Statutory overview.  The act requires MTBA communities[3] to zone for "at least [one] district of reasonable size" where multifamily housing is permitted "as of right."[4]  G. L. c. 40A, § 3A (a) (1).  The act further defines "a district of reasonable size" and specifies that any such district must be situated within one-half mile of an MTBA facility.[5]  Id.  Noncompliant MBTA communities are ineligible for funds from certain State funding sources.  G. L. c. 40A, § 3A (b).[6]  The last paragraph of § 3A directs HLC,[7] in consultation with three other State agencies, to "promulgate guidelines" to determine if an MBTA community has complied with the act.  G. L. c. 40A, § 3A (c).[8]
      2.  Implementation of the act.  Shortly after the act was passed, HLC issued a preliminary announcement describing the act and giving notice of its intention to produce detailed guidelines.  Over the next two years, HLC issued draft guidelines, conducted community presentations, and solicited feedback directly from affected communities.[9]  HLC also consulted with other agencies, including the Massachusetts Department of Transportation (MassDOT) and the MBTA in preparing the final guidelines.  It did not, however, file with the Secretary of the Commonwealth a notice of public hearing, a notice of proposed adoption or amendment of a regulation, or a small business impact statement within the meaning of the APA.[10]  See G. L. c. 30A, §§ 2, 3.  HLC issued its final guidelines on August 17, 2023.
      3.  Facts and procedural posture.  The town initially took steps to comply with the act.  Between August of 2022 and December of 2023, the town's planning and select boards engaged in discussions relating to G. L. c. 40A, § 3A.  The town also applied for and received grant money, which it used to hire a planning and design consultant to create a zoning plan.  In January of 2023, Milton submitted to HLC its "action plan" indicating that it sought to be considered in "interim compliance" with the act.
      Although the town raised some concerns regarding its classification under HLC's guidelines,[11] on December 11, 2023, at a special town meeting, its representative town meeting approved, by a vote of 158 to 76, a proposed zoning bylaw (Article 1) that would have complied with HLC's guidelines.[12]  However, pursuant to the town charter, a sufficient number of the town's voters petitioned to have Article 1 submitted to a town-wide referendum vote; so, less than three weeks after the initial vote approving the bylaw, the select board voted to schedule a referendum on the article for February of 2024.[13]  Before the vote was held, both HLC and the Attorney General sent letters to town officials, giving notice that they would enforce the funding penalties listed in § 3A and take legal action should the town fail to comply with the act.  The town held the referendum on February 14, 2024, and the voters rejected the proposed zoning bylaw by a margin of approximately eight percentage points.[14]
      Shortly after the referendum, the Attorney General filed before a single justice of this court a complaint against the town and its building commissioner seeking declaratory and injunctive relief to enforce compliance with G. L. c. 40A, § 3A, as set forth in HLC's guidelines.  See G. L. c. 231A, § 1; G. L. c. 214, § 1.  Milton filed an answer denying that it was in violation of § 3A and filed a counterclaim against the Attorney General and HLC seeking declaratory relief.  The single justice reserved and reported the case to the full court.
      Discussion.  Among other things, the town asserts that § 3A provides for an unconstitutional delegation of legislative authority, that the Attorney General lacks the power to enforce the act, and that HLC's guidelines were not promulgated in accordance with the APA.  We address these claims in turn.
      1.  Constitutionality of § 3A.  Milton argues that § 3A violates the separation of powers doctrine because the act vests HLC with the power to make fundamental policy decisions by requiring what the town calls "transformative zoning changes" in MBTA communities.  We are not persuaded.
      Article 30 of the Massachusetts Declaration of Rights stands for the "general principle that the Legislature cannot delegate the power to make laws."  Robinhood Fin. LLC v. Secretary of the Commonwealth, 492 Mass. 696, 714 (2023), quoting Construction Indus. of Mass. v. Commissioner of Labor & Indus., 406 Mass. 162, 171 (1989).  Importantly, however, a categorically unyielding division of governmental powers "is neither possible nor always desirable."  Opinion of the Justices, 365 Mass. 639, 641 (1974).  To determine whether a legislative delegation of authority violates the separation of powers doctrine, we consider three factors: 
"(1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or . . . sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?"
Robinhood Fin. LLC, supra, quoting Chelmsford Trailer Park, Inc. v. Chelmsford, 393 Mass. 186, 190 (1984).  With regard to the first prong, the language of the act itself makes plain the Legislature's policy goal:  "[a]n MBTA community shall have a zoning ordinance or [bylaw] that provides for at least [one] district of reasonable size in which [multifamily] housing is permitted as of right."[15]  G. L. c. 40A, § 3A (a) (1).  The act further defines a "district of reasonable size," specifying that it "shall . . . have a minimum gross density of [fifteen] units per acre, subject to [certain specified limitations]; and . . . be located not more than 0.5 miles from a commuter rail station, subway station, ferry terminal or bus station."  Id.  Thus, by delegating to HLC the power to determine whether a city or town is in compliance with § 3A, the Legislature has not abandoned its policy-making role.  See G. L. c. 40A, § 3A (c).  Indeed, the Legislature routinely assigns to others the implementation of a policy adopted through the enactment of a statute.  See Commonwealth v. Clemmey, 447 Mass. 121, 136-137 (2006); Opinion of the Justices, 393 Mass. 1209, 1219 (1984) ("Legislature may delegate to an officer of the executive branch the working out of the details of a policy established by the General Court").  We long have recognized that "[t]o deny this [power] would be to stop the wheels of government."  Commonwealth v. Diaz, 326 Mass. 525, 527 (1950), quoting Field v. Clark, 143 U.S. 649, 694 (1892).  Tasking HLC, in consultation with other relevant agencies, to determine whether a city or town has complied with the requirement that it have a zoning ordinance or bylaw providing for a "district of reasonable size" where multifamily housing is permitted "as of right," G. L. c. 40A, § 3A (a) (1), allows subject-matter experts to tailor the guidelines to fit the "real-world" conditions of each MBTA community affected by the act by, for example, taking into account a community's land area, population, existing housing stock, or other relevant factors, Clemmey, supra at 137.
      As to the second prong, the act provides an "intelligible principle" to guide HLC in this exercise of authority.  Robinhood Fin. LLC, 492 Mass. at 715.  As discussed supra, under § 3A (a) (1), a district of "reasonable size" must have a "minimum gross density of [fifteen] units per acre" and be located within one-half mile of an MBTA facility.  The parameters provided by the act, in addition to the requirement that the size of the district be "reasonable," are enough to guide the agency in issuing rules to determine whether an MBTA community complies with the act's requirements.  See Robinhood Fin. LLC, supra (guidance sufficient where regulations must be "necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of [the statute]" [citation omitted]); Tri-Nel Mgt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 226 (2001) (guidance sufficient where statute required "reasonable" regulations to "address the 'health' of the community").
      As for guarding against potential abuses of discretion by the agency, the act "sufficiently demarcate[s] the boundaries of regulatory discretion."  Tri-Nel Mgt., Inc., 433 Mass. at 226.  As explained supra, HLC's regulatory powers must be reasonable as well as guided by other requirements of the act.  In addition to the limitations on "content and reasonableness," id., the act requires HLC to promulgate guidelines in consultation with three other State agencies.  See Clemmey, 447 Mass. at 138 (consultation with advisory committee safeguards against abuse of discretion).  Moreover, as with any agency regulation, an aggrieved party may seek judicial review.  See G. L. c. 30A, § 7; G. L. c. 231A.  See also Tri-Nel Mgt., Inc., supra (ability to seek judicial review of agency's regulation through action for declaratory relief provides important safeguard against abuse of discretion by agency).
      2.  Power of the Attorney General.  Milton also asserts that the Attorney General is unauthorized to bring the instant action because, although § 3A provides for certain consequences for noncompliance, a suit in equity to enforce the provision is not one of them.  Here again we are unconvinced.[16]
      This court long has recognized that the Attorney General has broad powers to enforce the laws of the Commonwealth.  See Commonwealth v. Mass. CRINC, 392 Mass. 79, 88 (1984).  The Attorney General has a general statutory duty to 
"take cognizance of all violations of law or of orders of courts, tribunals or commissions affecting the general welfare of the people . . . and shall institute . . . such criminal or civil proceedings . . . as [s]he may deem to be for the public interest, and shall investigate all matters in which [s]he has reason to believe that there have been such violations."
G. L. c. 12, § 10.[17]  The Attorney General "also has a common law duty to represent the public interest and enforce public rights."  Mass. CRINC, supra, citing Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 48 (1979).  We traditionally have construed the term "public interest" broadly, including where the law concerns rights to land and property use.  See, e.g., Attorney Gen. v. Dime Sav. Bank of N.Y., FSB, 413 Mass. 284, 287-288 (1992) (Attorney General properly sought to enjoin trespass actions initiated by foreclosing mortgagee against holdover mortgagors and tenants in possession of foreclosed premises); Attorney Gen. v. Williams, 174 Mass. 476, 483 (1899) (Attorney General properly sought to enforce statute limiting height of buildings in Copley Square to protect public interest).
      The town contends that the Attorney General is not authorized to enforce § 3A because the act does not so provide.  But the Attorney General's enforcement power is not dependent upon whether a particular statute happens to reference it.  See, e.g., Dime Sav. Bank of N. Y., FSB, 413 Mass. at 287 (pursuant to G. L. c. 12, § 10, Attorney General authorized to enjoin use of trespass actions to eject holdover mortgagors and tenants even though no explicit statutory authorization).  Given the Attorney General's broad authority to act in the public interest, and the fact that the public has an interest in the enforcement of § 3A, the Attorney General is empowered to enforce § 3A, notwithstanding the lack of any reference to such power in that statute.  See G. L. c. 12, § 10.
      The town additionally asserts that the Attorney General may not bring an enforcement action because § 3A already includes consequences for noncompliance, i.e., ineligibility for certain funding sources.[18]  In doing so, the town relies on the statutory maxim "expressio unius est exclusio alterius," i.e., the expression of one thing implies the exclusion of others.  To be sure, we employ this canon of construction from time to time.  See, e.g., Phillips v. Equity Residential Mgt., L.L.C., 478 Mass. 251, 259 & n.19 (2017).  The town's reliance on it in this case, however, is inapt.  See Halebian v. Berv, 457 Mass. 620, 628 (2010), quoting 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47.25, at 429 (7th ed. 2007) ("the maxim of negative implication -- that the express inclusion of one thing implies the exclusion of another -- 'requires great caution in its application'").
      If we were to adopt the town's interpretation, the only consequence to an MBTA community for failing to comply with the act would be the loss of certain funding opportunities.  Thus, those communities, like the town in this case, which choose to forgo the identified funding programs, would be free to ignore the legislative decision to require towns benefiting from MBTA services to permit their fair share of multifamily housing near their local MBTA stations and terminals.  As the purpose of § 3A is to increase housing stock, the town's proposed reading of the act would thwart the Legislature's purpose by converting a legislative mandate into a matter of fiscal choice.  See Bank of Am., N.A. v. Rosa, 466 Mass. 613, 619-620 (2013), and cases cited (statutory maxim "should not be applied where to do so would frustrate the general beneficial purposes of the legislation").
      Moreover, the town's interpretation effectively nullifies the power afforded to the Attorney General under G. L. c. 12, § 10.  In light of the Attorney General's unique and well-established role as a protector of public rights, we conclude that the penalties provided for in the act do not preclude the equitable relief that the Attorney General is authorized to pursue under her broad statutory power.  See Ryan v. Mary Ann Morse Healthcare Corp., 483 Mass. 612, 620 (2019), quoting School Comm. of Newton v. Newton Sch. Custodians Ass'n, Local 454, SEIU, 438 Mass. 739, 751 (2003) ("In the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other").
      3.  The HLC guidelines.  Finally, Milton argues that the guidelines as promulgated are ineffective because HLC failed to comply with the APA.  See G. L. c. 30A.  We agree.
      The purpose of the APA is to "'establish a set of minimum standards of fair procedure below which no agency should be allowed to fall' and to create uniformity in agency proceedings" (citation omitted).  Carey v. Commissioner of Correction, 479 Mass. 367, 371 (2018).  To that end, the APA requires State agencies (like HLC) to take certain steps when promulgating regulations in order to "give notice and afford interested persons an opportunity to present data, views, or arguments."  Id., quoting G. L. c. 30A, § 3.  "Under the APA, a regulation 'includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect . . . adopted by an agency to implement or interpret the law enforced or administered by it.'"  Carey, supra, quoting G. L. c. 30A, § 1 (5).
      Here the Attorney General contends that HLC is not required to adhere to the c. 30A procedure because the act directs the agency to promulgate "guidelines" rather than "regulations."  See G. L. c. 40A, § 3A (c).  The Attorney General further asserts that even if the APA does apply, HLC substantially complied with the statute, and thus any omissions should be considered harmless error.  These arguments are unpersuasive.
      General Laws c. 40A, § 3A (c), specifically directs HLC to "promulgate guidelines to determine if an MBTA community is in compliance."  And HLC's guidelines do just that, both interpreting and implementing the act.  Cf. G. L. c. 30A, § 1 (5).  For instance, the guidelines categorize MBTA communities into four groups based on the MBTA facilities within or adjacent to their borders[19] and detail what each community must do to achieve a "reasonabl[y] size[d]" zoning district in order to be considered compliant with the act.[20]  See G. L. c. 40A, § 3A (a) (1).  The guidelines also explain how HLC determines whether a multifamily housing district has reached the statutorily mandated minimum density requirement of fifteen units per acre and specify whether the entirety of a community's multifamily housing district must be within one-half mile of the relevant MTBA facility.  See id.
      Moreover, the guidelines explain what it means to allow multifamily housing "as of right," and establish deadlines by which MBTA communities must submit "district compliance applications" to HLC.  Given the breadth, detail, substance, and mandatory requirements of the HLC guidelines in implementing the act, we reject the agency's position that the "guidelines" referenced in § 3A are meant to be exempt from the APA's broad definition of "regulation."[21]
      Having determined that the guidelines contemplated by the act fall within the ambit of regulations as defined by the APA, they must be promulgated pursuant to that statute.  See G. L. c. 30A, § 3.  Under G. L. c. 30A, § 3, agencies engaged in the rulemaking process must, among other things, file notice of a proposed regulation with the Secretary of the Commonwealth, along with a small business impact statement.  Here, HLC has admitted that it failed to take either of these necessary steps.  The Attorney General suggests that this court should apply a harmless error standard because, she argues, HLC substantially complied with the statute.  However, the APA leaves no room for substantial compliance.  Strict compliance for agencies promulgating rules is compelled by the plain terms of the statute.  See G. L. c. 30A, § 5 (referencing § 3, "no rule or regulation . . . shall become effective until an agency has filed with the state secretary a statement considering the impact of said regulation on small business").  And strict compliance also furthers the purpose of the APA:  to set minimum standards of fair procedure and ensure uniformity in agency proceedings.  Carey, 479 Mass. at 371.
      Because HLC failed to comply with the APA, HLC's guidelines are legally ineffective and must be repromulgated in accordance with G. L. c. 30A, § 3, before they may be enforced.[22]  See Massachusetts Gen. Hosp. v. Cambridge, 347 Mass. 519, 523 (1964) (failure to comply with APA requirements and "properly file[]" regulations with Secretary of Commonwealth under G. L. c. 30A, §§ 3, 5, rendered regulations ineffective); Kneeland Liquor, Inc. v. Alcoholic Beverages Control Comm'n, 345 Mass. 228, 235 (1962) ("Inasmuch as there was no compliance with either [G. L. c. 30A,] § 2 [3] or § 3 [3], the regulations were invalidly enacted . . .").[23]
      Conclusion.  For the foregoing reasons, we declare that the act creates an affirmative duty for each MBTA community to have a zoning bylaw that allows for at least one district of reasonable size where multifamily housing is permitted as of right, as dictated by G. L. c. 40A, § 3A, and that the act's delegation of authority to HLC to promulgate guidelines does not violate art. 30 of the Massachusetts Declaration of Rights.  We further declare that the Attorney General has the power to bring suit for declaratory and injunctive relief to enforce § 3A and its corresponding guidelines.  However, because HLC's current guidelines were not promulgated in accordance with the APA, we declare them ineffective and, as such, presently unenforceable.
      The case is remanded to the county court, where the single justice is directed to enter a declaratory judgment consistent with this opinion.  The remainder of the claims are dismissed.
 
So ordered.
footnotes

          [1] Building commissioner of Milton.
          [2] We acknowledge the amicus briefs submitted by William J. Driscoll, Jr., and Thomas J. Dougherty; town of Hamilton; town of Middleborough; Eastern Massachusetts Small Business Coalition; Massachusetts AFL-CIO; New England Legal Foundation; Real Estate Bar Association for Massachusetts, Inc.; Denny Swenson and concerned town citizens; Brian O'Halloran and concerned citizens; former Massachusetts Attorneys General; Pioneer Public Interest Law Center and Associated Industries of Massachusetts; Massachusetts Housing and Shelter Alliance, Inc., Father Bill's & MainSpring, Inc., Planning Office for Urban Affairs, Inc., and United Way of Massachusetts Bay, Inc.; Central Massachusetts Housing Alliance, Greater Boston Latino Network, Inquilinos Boricuas en Acción, Haitian-Americans United, Inc., and Immigrant Family Services Institute; John Kolackovsky; the Metropolitan Area Planning Council, the Massachusetts Association of Regional Planning Agencies, and the American Planning Association Massachusetts Chapter; NAIOP Massachusetts, Inc.; Abundant Housing MA, Inc., A Better Cambridge, Inc., Brookline for Everyone, Inc., Chris Herbert, Jenny Schuetz, and John Infranca; Massachusetts Housing Partnership Fund Board; Stephen M. Acerra, Jr.; Homes for All Massachusetts and Transportation for Massachusetts; Ellen Wright; and Citizens' Housing and Planning Association, Engine 6 Newton Housing Advocates, Disability Policy Consortium, Inc., Metropolitan Boston Housing Partnership, Inc., Housing Medford, Building a Better Wellesley, Greater Boston Real Estate Board, Preservation of Affordable Housing, Inc., Affordable Inclusive Milton, Home Builders and Remodelers Association of Massachusetts, Inc., Metro West Collaborative Development, Inc., Greater Boston Interfaith Organization, Inc., Massachusetts Association of Realtors, The Community Builders, Inc., Charles River Regional Chamber, Inc., Massachusetts Association of Community Development Corporations, WinnDevelopment Company Limited Partnership, Planning Office for Urban Affairs, Inc., Massachusetts Housing Finance Agency, Eastern Bank, 2Life Communities, Inc., Revere Housing Coalition, Acton Housing for All, United Way of Massachusetts Bay, Inc., Massachusetts Business Roundtable, Inc., B'nai B'rith Housing New England, Inc., Beacon Communities, LLC, Black Economic Counsel of Massachusetts, Inc., Capstone Communities LLC, Belmont Town of (More!) Homes, Redgate Capital Partners, Community Economic Development Assistance Corporation, Harborlight Community Partners, Inc., Jewish Alliance for Law and Social Action, Inc., and Housing Navigator Massachusetts, Inc.  We also acknowledge the amicus letter submitted by the Winthrop Says No to 3A Committee.
               [3] Chapter 40A defines an "MBTA community" to include "the [fourteen] cities and towns as defined in [G. L. c. 161A, § 1]."  G. L. c. 40A, § 1A.  Milton falls within this definition.  G. L. c. 161A, § 1.
               [4] Chapter 40A defines "[multifamily] housing" as "a building with [three] or more residential dwelling units or [two] or more buildings on the same lot with more than [one] residential dwelling unit in each building."  G. L. c. 40A, § 1A.  Zoning "as of right" is defined as "development that may proceed under a zoning ordinance or by-law without the need for a special permit, variance, zoning amendment, waiver or other discretionary zoning approval."  Id.
     [5] General Laws c. 40A, § 3A (a) (1), states:
"An MBTA community shall have a zoning ordinance or [bylaw] that provides for at least [one] district of reasonable size in which [multifamily] housing is permitted as of right; provided, however, that such [multifamily] housing shall be without age restrictions and shall be suitable for families with children.  For the purposes of this section, a district of reasonable size shall:  (i) have a minimum gross density of [fifteen] units per acre, subject to any further limitations imposed by [G. L. c. 131, § 40,] and title 5 of the state environmental code established pursuant to [G. L. c. 21A, § 13]; and (ii) be located not more than 0.5 miles from a commuter rail station, subway station, ferry terminal or bus station, if applicable."
          [6] Pursuant to § 3A (b), noncompliant communities are ineligible to receive funds from the Housing Choice Initiative, the Local Capital Projects Fund, the MassWorks infrastructure program, and the HousingWorks infrastructure program.  G. L. c. 40A, § 3A (b).
               [7] An earlier version of the act delegated this duty to HLC's predecessor agency, the Department of Housing and Community Development.  See St. 2021, c. 29, § 10.  For the sake of clarity, this opinion will refer to the agency in charge of implementing the act as HLC.
               [8] General Laws c. 40A, § 3A (c), states:
     "The executive office of housing and livable communities, in consultation with the executive office of economic development, the Massachusetts Bay Transportation Authority and the Massachusetts Department of Transportation, shall promulgate guidelines to determine if an MBTA community is in compliance with this section."
          [9] The town itself submitted comments, which HLC appears to have incorporated into its final guidelines.
               [10] Concomitant with its failure to file a small business impact statement, it also appears from the record provided to this court that HLC did not file an estimate of the guidelines' "fiscal effect," pursuant to G. L. c. 30A, § 5.
               [11] Approximately nine months after submitting its action plan, Milton sent HLC a letter raising doubts that it had properly been categorized as a rapid transit community -- the community classification necessitating the largest district of multifamily housing under HLC's guidelines.  HLC responded that, based on the guidelines, Milton properly had been classified as a rapid transit community.
          [12] The town has a representative town meeting form of government that convenes for an annual meeting each spring and for any special meetings called by the town's select board or by petition.
               [13] According to section 7 of the town's charter, petitioners must gather the signatures of at least five percent of the town's registered voters in order to a call for a referendum on an article approved by the representative town meeting.
               [14] Approximately fifty-four percent of the voters (5,115) rejected Article 1, and forty-six percent (4,346) voted to approve it.
          [15] We note that the plain language of § 3A (a) (1) states that municipalities "shall" have a zoning ordinance that allows for multifamily housing as of right.  G. L. c. 40A, § 3A (a) (1).  "The word 'shall' is ordinarily interpreted as having a mandatory or imperative obligation."  Hashimi v. Kalil, 388 Mass. 607, 609 (1983).  Thus, it is clear that the Legislature intended to require MBTA communities to comply with the act.
          [16] As discussed infra, because we conclude that HLC's guidelines are ineffective, the need for declaratory relief regarding Milton's challenge to the Attorney General's enforcement powers is less immediate.  Nevertheless, we decide this question of law because both parties explicitly seek an answer to the question, "the case has been fully briefed on the merits, . . . there is a public interest in obtaining a prompt answer to the question, and . . . the answer . . . is reasonably clear" (citation omitted).  ENGIE Gas & LNG LLC v. Department of Pub. Utils., 475 Mass. 191, 196 (2016).  See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 547 (2012) ("declaratory judgment act must be 'liberally construed,' so as to effectuate its remedial goals of 'remov[ing], and . . . afford[ing] relief from, uncertainty and insecurity with regard to rights [and] duties'" [citation omitted]).
               [17] Although § 10 may have been crafted primarily in response to anticompetitive conduct regarding trade, we long ago rejected the argument that it limits the Attorney General's power to only that single domain.  Commonwealth v. Kozlowsky, 238 Mass. 379, 388-389 (1921).  To the contrary, we have consistently recognized that § 10 contains an "exceedingly broad" grant of power.  Id. at 388.  See, e.g., Mass. CRINC, 392 Mass. at 88; Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 48 n.20 (1979) (noting § 10 was originally titled, "An Act to enlarge the powers and duties of the attorney-general").
               [18] Although the town describes this consequence as a "remedy," neither the statutory language nor the record before us demonstrates that the penalty is designed (or able) to accomplish the desired compulsory aspect of the law.  See note 15, supra.  Cf. Shriver v. Woodbine Sav. Bank, 285 U.S. 467, 478-479 (1932) ("The very fact that the [statutory] remedy is on its face inadequate to compel full performance of the obligation declared is persuasive that it was not intended to be exclusive of applicable common-law remedies, by which complete performance might be secured"); Williams, 174 Mass. at 485 ("The kind of remedy provided by the statute in regard to the building laws gives no security to the public for the protection of their rights").
               [19] The guidelines classify each MBTA community as (i) a rapid transit community, (ii) a commuter rail community, (iii) an adjacent community, or (iv) an adjacent small town based on a set of definitions.  To illustrate, according to the guidelines, a rapid transit community is "an MBTA community that has within its borders at least 100 acres of developable station area associated with one or more subway stations, or MBTA Silver Line bus rapid transit stations."  Whereas a commuter rail community is " an MBTA community that (i) does not meet the criteria for a rapid transit community, and (ii) has within its borders at least 100 acres of developable station area associated with one or more commuter rail stations."
               [20] For example, multifamily housing districts in rapid transit communities, commuter rail communities, and adjacent communities must have a minimum land area of fifty acres or 1.5 percent of the community's developable land, whichever is less, while in adjacent small towns, there is no minimum land area requirement.  Further, to ensure that multifamily housing districts accommodate enough housing units, the HLC guidelines require MBTA communities to have a "minimum [multifamily] unit capacity," calculated based on a certain percentage of a community's existing total housing units.  Under this metric, the minimum multifamily unit capacity of a rapid transit community must accommodate twenty-five percent of the community's total housing units, a commuter rail community requires fifteen percent, an adjacent community requires ten percent, and an adjacent small town requires five percent.
               [21] We also note that the terms "guideline" and "regulation" are not mutually exclusive.  A "guideline" is "an indication or outline of policy or conduct."  Fairhaven Hous. Auth. v. Commonwealth, 493 Mass. 27, 32 (2023), quoting Merriam-Webster's Collegiate Dictionary 555 (11th ed. 2020).  This definition of "guideline," however, "does not preclude such rules from being mandatory."  Fairhaven Hous. Auth., supra.
           Moreover, if use of the word "regulation" were the dispositive factor in determining whether the APA applies, the Legislature's broad definition in G. L. c. 30A, § 1 (5), including a host of other terms, would amount to surplusage -- so too would its specific enumeration of exceptions.  Cf. Matter of a Civ. Investigative Demand Addressed to Yankee Milk, Inc., 372 Mass. 353, 358 (1977) ("established principle of statutory construction that every word in a statute should be given meaning").
          [22] As noted in note 10, supra, it appears from the record that HLC also failed to file with the Secretary of the Commonwealth a statement estimating the fiscal impact of the proposed regulations on the private and public sectors as required by G. L. c. 30A, § 5.  This, too, renders the guidelines ineffective.  See G. L. c. 30A, § 5 ("No rule or regulation so filed with the state secretary shall become effective until an estimate of its fiscal effect including that on the public and private sector, for its first and second year, and a projection over the first five-year period, or a statement of no fiscal effect has been filed with said state secretary").
               [23] As HLC will need to promulgate guidelines consistent with the APA's procedural requirements, and as those new guidelines may differ from the ones presently in place, we need not reach whether the existing guidelines are consistent with the act.